UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AL SHAMS INVESTMENTS LTD.; WAFIC RIDA SAÏD, <br><br>                          Plaintiffs, <br><br>       v. <br><br> PETROLEO BRASILEIRO S.A. – PETROBRAS; MARIA DAS GRACAS SILVA FOSTER; JOSÉ SERGIO GABRIELLI; ALMIR GUILHERME BARBASSA; PRICEWATERHOUSECOOPERS AUDITORES INDEPENDENTES, <br><br>                          Defendants. | Civil Case No. <br><br><br> **COMPLAINT** <br><br> **<u>JURY TRIAL DEMANDED</u>** |

## TABLE OF CONTENTS

**Page**

I. NATURE OF THE ACTION ............................................................... 1

II. JURISDICTION AND VENUE .......................................................... 4

III. PARTIES ........................................................................................... 5

 A. Plaintiffs ................................................................................. 5

  1. Al Shams Investments Limited ................................... 5

  2. Wafic Rida Saïd ......................................................... 5

 B. Defendants .............................................................................. 6

  1. Petrobras .................................................................... 6

  2. Individual Defendants ................................................ 7

  3. PricewaterhouseCoopers Auditores Independentes ................... 8

IV. SUMMARY OF SUBSTANTIVE ALLEGATIONS .......................... 8

 A. Petrobras's Expanding Need for Capital Investment ............... 8

 B. Rules and Regulations Governing Bidding for Petrobras Contracts ..................... 9

 C. Fraud and Bribery Schemes .................................................. 10

  1. The "Operation Car Wash" Investigation ................. 10

  2. The Scheme's Impact on Bidding for Petrobras Contracts ................ 12

  3. Bribes and Kickbacks Included in Petrobras Contracts ............. 13

  4. The Inflated Costs of Petrobras's Refineries and Other Projects ............. 15

  5. Petrobras's Senior Executives' Knowledge of the Scheme .................. 18

 D. Petrobras's Admission of Inflated Asset Values ..................... 20

 E. Petrobras's False and Misleading Financial Statements ............ 23

  1. 2009-2010 – United States GAAP Violations ............ 23

  2. 2011-2014 – IFRS Violations ................................... 26

F.      Petrobras's Accounting Firm's Willful Blindness of the Scheme ........................29

    1.      Red Flags That PwC Ignored Before Its Clean Reports ...........................30

    2.      Red Flags That PwC Ignored Following Issuance of Its Clean Reports ............................................................................................31

    3.      PwC's Failure to Comply with Governing Standards................................32

V.      EXCHANGE ACT...............................................................................................39

    A.      Overview of Claims ...............................................................................39

    B.      False and Misleading Statements ............................................................39

    C.      Petrobras's Corrective Disclosures and Their Impact on the Market ..................66

    D.      Defendants' Knowledge of the Fraudulent Scheme ..............................................79

        1.      Petrobras ................................................................................79

        2.      Foster.....................................................................................80

        3.      Gabrielli .................................................................................81

        4.      Barbassa .................................................................................82

        5.      PricewaterhouseCoopers Auditores Independentes ....................................82

    E.      Plaintiffs' Reliance upon Defendants' Misrepresentations to Their Detriment ............................................................................................82

        1.      Plaintiff's Actual Reliance on Defendants' Misrepresentations................82

        2.      The Fraud on the Market Presumption of Reliance .................................83

        3.      No Safe Harbor .......................................................................84

    F.      Plaintiffs' Losses as a Result of Their Purchases of Petrobras Securities ............85

VI.     CAUSES OF ACTION .........................................................................................85

    COUNT I For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants.........................................................................85

    COUNT II For Violations of Section 18 of the Exchange Act Against All Defendants ......................................................................................86

COUNT III For Violations of Section 20(a) of the Exchange Act Against the
Individual Defendants ............................................................................87

VII.    PRAYER FOR RELIEF ............................................................................88

VIII.   JURY DEMAND ........................................................................................88

Plaintiffs Al Shams Investments Limited and Wafic Rida Saïd, by and through their undersigned counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' allegations are based upon the investigation of Plaintiffs' counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Petroleo Brasileiro S.A. — Petrobras ("Petrobras" or the "Company"), regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, including statements to the media by various individuals regarding their participation in the kickback and bribery scheme detailed below, and other publicly available information concerning Petrobras, the Individual Defendants (as defined herein), and Petrobras's outside accountants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a federal securities action brought pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiffs purchased or otherwise acquired the securities of Petroleo Brasileiro S.A. ("Petrobras" or the "Company") in the United States at various times during the period from August 7, 2010 to April 22, 2015 (the "Relevant Period").

2.     Plaintiffs' Exchange Act claims allege that the Defendants engaged in a fraudulent scheme that artificially inflated the price of Petrobras securities during the Relevant Period.

3.     Before and throughout the Relevant Period, Petrobras pursued plans to expand its production capacity. These plans involved acquiring and contracting for the construction of new facilities and petroleum production assets. Petrobras's expansion plans required substantial

capital investment.  In order to satisfy its capital requirements, the Company undertook a number of securities offerings during the Relevant Period, selling more than $98 billion in securities registered on the New York Stock Exchange ("NYSE"), including American depositary shares ("ADSs") representing common and preferred stock.  During the Relevant Period, Petrobras's ADSs were one of the most actively traded shares on the New York Stock Exchange.

4.     Plaintiffs' claims arise from a series of false statements of material fact and omissions of material adverse information made by Defendants throughout the Relevant Period concerning: (1) the value of Petrobras's assets; (2) the Company's periodic expenses and net income; (3) the Company's anti-bribery and anti-corruption policies; and (4) whether the Company suffered from material weaknesses in its disclosure controls and procedures and internal controls over financial reporting.  When the Company issued a series of corrective disclosures that revealed some of the truth about these matters, the market value of the Petrobras securities purchased by Plaintiffs declined sharply, causing Plaintiffs to suffer losses.

5.     At its height in 2009, Petrobras was the world's fifth-largest company, with a market capitalization of $310 billion.  Now, with the revelation of Petrobras's rampant money-laundering and kickback scheme, Petrobras is worth just approximately $40 billion.  To date, Company executives have been jailed and powerful politicians across party lines—including the speakers of both Houses of Congress—have been questioned about the money-laundering and bribery scheme at Petrobras.  According to Brazilian prosecutors, construction and engineering firms paid roughly $800 million to politically appointed Petrobras executives in exchange for lucrative contracts with the Company, benefiting both the executives and the campaign coffers of the Workers' Party, a Brazilian political party that has governed at the federal level in a coalition government with several other parties since 2003.  The Petrobras executives that received the

bribes pocketed vast sums of money.  The executives also said they channeled portions of the bribes to the Workers' Party, some of which were used in Dilma Rousseff's successful 2010 campaign for reelection as the President of Brazil.

6.      The fraud at the center of this action involves a money-laundering scandal, in which Petrobras's contractors colluded to inflate bids, with Petrobras executives taking bribes and politicians sharing in the proceeds.  The bribery and money-laundering scheme is estimated by authorities to have diverted up to $28 billion from Petrobras's coffers.   In addition to Petrobras's top executives, the illegal bribery and kickback scheme also involved politicians and a group of at least 16 contractors who formed a cartel that assured that its members would win Petrobras's major contracts.  According to Brazilian prosecutors and the Brazilian Federal Police, Petrobras executives granted contracts to these Brazilian construction companies that systemically inflated their costs.   After winning the contracts, the construction companies kicked back up to 3% of a contract's total value in the form of bribes to Petrobras executives, Brazilian politicians, and money launderers.

7.      Petrobras's fraudulent scheme reached throughout the Company; as of February 13, 2015, two thousand Petrobras employees were under investigation.  Alberto Youssef—a black market money launderer who initially led investigators to the Petrobras scheme and now is cooperating with prosecutors in exchange for a reduced sentence—testified that the bribery and money-laundering scheme was rampant at Petrobras.  As explained more fully below, numerous top Petrobras executives who have been arrested for their involvement in the fraudulent scheme are now cooperating with the investigation, and have testified regarding the broad scope of the illegal activity.  All the while, Petrobras covered up the scheme and continuously deflected and denied wrongdoing, keeping investors in the dark.

8.     The Petrobras scheme ultimately calls into question the integrity of the Company as a whole.  The misstatements related to the value of Petrobras's oil-producing infrastructure, which was the core of its business.  Unsurprisingly, when the truth of the corruption began to emerge, the value of Petrobras securities declined materially.

## II.     JURISDICTION AND VENUE

9.     The asserted claims arise under Sections 10(b), 18, and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78r, and 78t(a), and Rule 10b-5 promulgated by the United States Securities and Exchange Commission ("SEC"), 17 C.P.R. § 240.10b-5.

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. 1391(b).  Petrobras maintains an office in this District, sponsors ADSs representing the Company's common and preferred equity that are listed on the New York Stock Exchange in this District, and certain of the acts that constitute the violations of law, including dissemination of materially false and misleading information to the investing public, occurred in and/or were issued from this District.

12.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.    PARTIES

#### A.    Plaintiffs

##### 1.    Al Shams Investments Limited

13.    Al Shams Investments Limited ("ASIL") is a limited liability company incorporated in Guernsey, Channel Islands.  ASIL makes investments at the direction of Plaintiff Wafic Rida Saïd.  ASIL purchased Petrobas ADSs at Mr. Saïd's direction and was damaged thereby.  The purchases were made in the United States.

##### 2.    Wafic Rida Saïd

14.    Plaintiff Wafic Rida Saïd is an individual resident of Monaco who is a renowned financier, businessman and philanthropist.  Mr. Saïd was born in Damascus, Syria in 1939 and moved to Switzerland in 1963 to work as a banker.  In 1969, Mr. Saïd visited Saudi Arabia and recognized it had a dire need for improved infrastructure.  Mr. Saïd started a company involved in construction that played a crucial role in building the airports, housing, and hospitals and other infrastructure that modernized Saudi Arabia.  Mr. Saïd has devoted much of his fortune to philanthropy, including through sizable donations to St. Mary's Hospital in Paddington, London, The Prince of Wales's Charitable Foundation, Eton College, and the Royal Shakespeare Company.  Mr. Saïd is the founding benefactor of the Saïd Business School at the University of Oxford and is the founding donor of the Wafic Saïd Molecular Cardiology Research Laboratories at the Texas Heart Institute.

15.    Mr. Saïd purchased the Petrobras ADSs at issue, through ASIL, and was damaged thereby.  The purchases were made in the United States.

B.     **Defendants**

1.     **Petrobras**

16.     Defendant Petrobras is a corporation organized under Brazilian law.  Its principal executive offices are located at Avenida República do Chile, No. 65, 23rd Floor, 20031-912, Rio de Janeiro, Brazil.  Petrobras also has an office at 570 Lexington Avenue, 43rd Floor, New York, New York 10022.  The Company's common and preferred shares are listed on the Bovespa, trading under the ticker symbols "PETR3" and "PETR4," respectively.  Since 2001, Petrobras has sponsored ADSs representing the Company's common and preferred equity that are listed on the NYSE, trading under the ticker symbols "PBR" and "PBR/A," respectively.

17.     Petrobras is an integrated oil and gas company that was incorporated in 1953 to conduct the Brazilian federal government's hydrocarbon activities.  The Company carries out crude oil and natural gas production and refining activities on behalf of the government.  Petrobras is one of the largest companies in Latin America, and as of December 31, 2013, the Brazilian federal government owned 50.26% of Petrobras's voting shares.

18.     Petrobras's operations account for the majority of Brazil's oil and gas production.  Petrobras operates substantially all of the refining capacity in Brazil and participates in most aspects of the Brazilian natural gas market.  The Company's revenue-generating activities are organized into six business segments: (1) exploration and production; (2) refining, transportation and marketing; (3) gas and energy; (4) distribution; and (5) international.  The Company has additional non-revenue generating divisions, including the services division.  The services division was responsible for designing and overseeing the construction and development of Petrobras's large-scale capital projects, including construction of new refineries.

19.     Petrobras has stated in SEC filings that its "most important tangible assets" were reported on its balance sheet as property, plant, and equipment ("PP&E").  During the Relevant Period, PP&E constituted the majority of the Company's assets.

## 2.     Individual Defendants

20.     Defendant Maria das Graças Silva Foster ("Foster") served as CEO of Petrobras from February 13, 2012 to February 4, 2015, when she resigned.  During the Relevant Period, Foster certified and signed certain of the Company's periodic financial reports filed with the United States Securities and Exchange Commission ("SEC"), communicated with investors, and participated in the Company's periodic conference calls.  Before Foster became CEO, she served as the Company's Director of Gas and Energy business division (defined below).

21.     Defendant José Sergio Gabrielli ("Gabrielli") served as Chief Executive Officer ("CEO") of Petrobras from July 22, 2005 to February 13, 2012.  During the Relevant Period, Gabrielli certified and signed certain of the Company's periodic financial reports filed with the SEC, communicated with investors, and participated in the Company's periodic conference calls.  Gabrielli resigned as CEO on or around January 23, 2012.

22.     Defendant Almir Guilherme Barbassa ("Barbassa") served as Chief Financial Officer ("CFO") of Petrobras during the Relevant Period and signed certain of the Company's periodic financial reports filed with the SEC, including the 2010, 2011, 2012, and 2013 Forms 20-F.

23.     Defendants identified in paragraphs 20-22 may be referred to as the "Individual Defendants."

7

3.      PricewaterhouseCoopers Auditores Independentes

24.      Defendant PricewaterhouseCoopers Auditores Independentes ("PwC") served

as Petrobras's independent auditor for the years 2012, 2013, and 2014.  PwC is based in São

Paulo, Brazil, and is a member firm of PricewaterhouseCoopers International Limited.

## IV.      SUMMARY OF SUBSTANTIVE ALLEGATIONS

### A.      Petrobras's Expanding Need for Capital Investment

25.      Petrobras's business activities required heavy capital investment.  To capitalize

on Brazil's oil reserves, Petrobras had to invest billions of dollars in exploratory drilling, oil rigs,

and other infrastructure.

26.      In 2006, Petrobras discovered large oil reserves miles from the Brazilian coast.

These reserves were below an approximately one-mile layer of sodium chloride, which itself was

below an approximately two-kilometer layer of rock underneath the Atlantic Ocean floor.  These

fields are referenced as the "pre-salt fields."

27.      The exploration and development of these pre-salt fields was challenging and

expensive.  The fields were located 300 kilometers from the Brazilian coast in water greater than

two-kilometers deep.  Moreover, the area where the pre-salt fields were discovered often

experienced severe oceanic conditions.  After drilling an oil well, Petrobras would then be

required to build or lease floating production, storage, and offloading vessels.  Then, the

Company would have to transport the crude oil to refining facilities.

28.      In the years leading up to 2010, when Petrobras announced that it would

explore and develop these pre-salt fields, market analysts were concerned that the Company

might become "overwhelmed" with the projects given the complicated financing and project

management that would be required by the sprawling developments.  These analysts estimated

that constructing a single pre-salt well would cost $100 to $150 million and that one significant

pre-salt field could require up to 200 wells.  Moreover, they estimated that it could cost the

Company over $600 billion to operate the pre-salt wells during the wells' lifetimes.

29.      As the Company was embarking on exploration and development of the pre-salt fields, in 2007 it announced plans to build Brazil's first new oil refineries since 1980.

Gabrielli (then Petrobras's CEO) stated that the new refineries—specifically, the Abreu e Lima

and Comperj refineries (the "Abreu Refinery" and "Comperj Refinery," respectively)—would

transform Brazil's economy by enabling the country to be self-sufficient in oil refining by 2015.

30.      During the same time, Petrobras paid $360 million for a 50% stake in a

refinery in Pasadena, Texas (the "Pasadena Refinery").  The other 50% holder then exercised a

put option that required Petrobras to purchase the remaining interest in the refinery.  All told,

Petrobras paid a total of ***$1.18 billion*** to acquire the Pasadena Refinery—a refinery that was

purchased for just $42.5 million one year earlier.

### B.      Rules and Regulations Governing Bidding for Petrobras Contracts

31.      Throughout this period, Petrobras hired outside contractors to supply goods

and/or services to the Company's various business segments, including those necessary to

construct the new refineries.  Since 1998, bidding for contracts with Petrobras was governed by

the "Simplified Bidding Procedure Regulations" and the "Petrobras Procurement Manual."

These guidelines were intended to encourage open and honest bidding for contracts with the

Company.  In 2011, in anticipation of the 2014 World Cup and 2016 Olympic Games, Brazil

enacted legislation called the "Differential Public Procurement Regime" to streamline

procurement bids and contracts at Brazilian companies, including Petrobras.

32.      When the Differential Public Procurement Regime was enacted, the Company

represented that "[t]o reduce our exposure to fraud and corruption risks, we established

segregation of functions among employees who demand goods or services, those who conduct

the procurement process, and those who are responsible for approving it.  We also established limits of authority, updated and approved periodically by the Executive [Directorate], for the signing of contracts."[1]

33.      The Company's services division largely managed Petrobras's procurement processes.  When business segments commissioned new projects for their division, the services division would create the basic design, conduct the bidding process, select the outside contractor(s) to execute the project, and oversee the construction of the project.  Upon completion, the business segment would take over the project.  From 2003 to 2012, Renato Duque headed the services division.  As discussed below, Duque was a central figure in the fraud and bribery schemes.

**C.      Fraud and Bribery Schemes**

**1.      The "Operation Car Wash" Investigation**

34.      In or about July 2013, the Brazilian federal police ("DPF") secretly launched an investigation code-named "Operação Lava Jato," or "Operation Car Wash," focused on a scheme run by black-market money dealers, including career criminal and money launderer Alberto Youssef, who were thought to have illegally transferred and laundered approximately $3.8 billion using, among other things, the purchase and sale of luxury automobiles.  The investigation became public on or about March 17, 2014, and on or about March 20, 2014, Brazilian police arrested Paulo Costa ("Costa"), a director of Petrobras's refining, transportation and marketing division, but Petrobras continued to deny any wrongdoing or that the investigation would impact its financial reporting until October 27, 2014.

---

[1]   The "Executive Directorate" is the managing body of Petrobras.  Each member is a Petrobras officer, member of the Administrative Council, and responsible for the day-to-day management of particular department(s) or function(s) within Petrobras.

35. Costa was a member of Petrobras's senior management and the Company's Chief Downstream Officer and Director of Supply from May 14, 2004 through April 2012. In that position, Costa was the top executive in charge of Petrobras's refining division, and reported directly to the CEO. Costa's arrest was based on documentation linking Costa to another person implicated in the money laundering scheme. When the police raided Costa's home, they found a stash of R$380,000 in Brazilian currency, $181,000 in U.S. currency, a $120,000 sport utility vehicle, and his diary, in which he had written, "Rooting out corruption is the ultimate goal of those who have not yet come to power." Among other things, Costa has admitted to Brazilian prosecutors that he received R$1.5 million (approximately $636,000) in connection with Petrobras's purchase of the Pasadena Refinery.

36. Costa subsequently agreed to cooperate with prosecutors and has since testified that he turned Petrobras's refining division into a slush fund for the Workers' Party. Pedro Barusco ("Barusco"), a former manager in Petrobras's engineering and services division, similarly testified at a Brazilian Congressional hearing that the Workers' Party received up to $200 million in payments that had been skimmed from Petrobras contracts. Both Costa and Barusco have testified that the corruption, bribery, and intentional contract inflation at Petrobras have been ongoing for more than a decade.

37. In December 2014, Brazil's Comptroller General initiated cases against eight construction companies with ties to Petrobras; in March 2015, the Comptroller General announced it had opened cases against ten more. So far, at least 23 contractors, including some of the largest construction firms in Brazil, have been implicated in the scandal. Multi-national corporations have also been implicated, including corporations in Singapore, Switzerland, and Britain. As of March 2015, there already had been over 40 indictments on racketeering, bribery

and money laundering charges.  On July 20, 2015, three executives of one of Brazil's largest construction companies were convicted on charges related to the Petrobras scandal, the first construction-industry executives to be convicted.    Prosecutors have asked the Brazilian Supreme Court to investigate dozens of sitting politicians, including the speakers of both houses of the Brazilian Congress, for allegedly receiving bribe money.

### 2.    The Scheme's Impact on Bidding for Petrobras Contracts

38.    The Operation Car Wash investigation and testimony from cooperating witnesses have revealed that Petrobras was an active participant in a bidding scheme designed to eliminate any type of competitive bidding process and to award contracts instead to those bribing Petrobras executives and government officials.  Costa explained that because there were only a handful of Brazilian companies with the technical capability and capacity to handle the large scale projects Petrobras sought to undertake, the companies formed a cartel (the "Cartel") designed to frustrate and render ineffective any competitive bidding process.

39.    According to Costa's testimony, to ensure that contracts were awarded to the Cartel and that bribes were paid to Petrobras executives and government officials, Petrobras adopted the following scheme:

- Each of the Petrobras business segments was assigned a sponsor from a patron political party (known inside Petrobras as a "Padrinho" or "Godfather").

- The Godfather would nominate a director for the business segment, who would then be selected by the Petrobras Board of Directors.

- It was made perfectly clear to each director of the business segment that the director's job security depended on keeping the Godfather (and the Godfather's political party) happy, which was accomplished by including a 3% kickback in every major contract.

- The scheme would only work, however, if all contractors cooperated.  To gain the contractor's cooperation, the Cartel agreed to establish a committee among the participating members that would decide who would win each contract, equitably rotating the "winners" between members.

- The companies agreed that they would coordinate their bids with the respective director of the business segment.

40.     Before the Company opened bidding for a contract, it would calculate the expected labor and supply costs for the project.  The Company would then solicit bids for the contract, and had a policy that it would consider reasonable any bids within the range of 15% below and 20% above the internal estimate.

41.     Prior to soliciting bids, however, Petrobras would inform the Cartel of Petrobras's internal cost estimate, and the Cartel members would adjust their bids accordingly such that all of the bids came in at or near the 20% ceiling.  As Barusco explained, contracts with the Cartel were always "signed near the maximum amount for the internal budget of Petrobras."

42.     Petrobras was aware of, and participated in, the Cartel's fixed bidding scheme.  Costa testified that the Petrobras Board of Directors was aware of the scheme from the beginning and never would question the overstated bids.  Petrobras reportedly participated in the Cartel's dealings through periodic meetings with the Brazilian Industrial Engineering Association (Abemi), at which they would negotiate contracts.  Petrobras acted to standardize procedures for contracts with the engineering companies now implicated in Operation Car Wash.  Minutes of certain meetings held at Petrobras headquarters in Rio de Janeiro show that Petrobras sent early drafts of contracts and calls for tender for Abemi's analysis before they officially were launched by Petrobras.  In the minutes, Petrobras workers spell out to the contractors how they should present claims for contract addenda in order to avoid refusal.

### 3.     Bribes and Kickbacks Included in Petrobras Contracts

43.     These contractors' coordinated overbids included a 3% kickback that would be paid to Petrobras executives, political parties, and money launderers. Costa testified that Cartel members would meet regularly in São Paulo or Rio de Janeiro to decide which contract would go

13

to which company, and the percentage by which the Cartel's bids would be overstated to cover the necessary bribes and kickbacks. If any Cartel member failed to include the required 3% kickback, the Cartel would disqualify the non-conforming member from future bidding.

44.     Costa testified that for at least seven years, he and other Petrobras executives accepted bribes "from companies to whom Petrobras awarded inflated construction contracts" and "then used the money to bribe politicians through intermediaries to guarantee they would vote in line with the ruling party while enriching themselves." Costa revealed that a group of politicians, including members and allies of Rousseff's Workers' Party, had accepted bribes linked to Petrobras contracts. Costa testified that he personally received tens of millions of dollars in bribes and referred to them as a "three percent political adjustment."

45.     Costa testified that Petrobras was engulfed in a culture of "political patronage," where career advancement was based on cronyism, not merit. Because the Government of Brazil was Petrobras' majority shareholder, all Board nominations, including that of the President, were made by the ruling political parties, with the Workers Party having the majority of the seats. Costa testified that he aligned himself with the Partido Progressista (the Progressive Party), and knew that if he were to be selected as a Director, he would have to meet the Progressive Party's demands or else be replaced. Costa stated that this *quid pro quo* applied to all executive level positions that were part of the patronage system and included diverting funds and resources from works and contracts falling under the control of the official.

46.     According to Costa, the Directory of Services at Petrobras was responsible for the Company's largest contracts, totaling approximately 90% of applied resources. That Directory was controlled by the Workers' Party, first through Petrobras's Director, Pedro Barusco, and then through Renato Duque, who succeeded Barusco. Costa explained that the

Petrobras Presidency and seven of Petrobras's Directories were divided up among the political parties forming the majority coalition. For the Directories under the Workers' Party's control, all of the bribe money was delivered to the party treasurer Josê Vaccari. Even for money coming through other Directories not directly under the Working Parties' control, a majority of the bribes always went to Vaccari and the Workers' Party, with the Directory's sponsoring political party and certain "facilitators" (*i.e.*, money launderers) taking the rest of the bribe money.

### 4.     The Inflated Costs of Petrobras's Refineries and Other Projects

#### (a)     The Pasadena, Texas Refinery

47.     Reportedly, in 2006, Petrobras drastically overpaid for a refinery in Pasadena, Texas, paying $360 million for a 50% stake in the refinery even though the entire refinery had been sold just a year earlier for $42.5 million. After a legal dispute with the owner of the other 50% share and interest payments, Petrobras ended up paying a total of $1.18 billion to own the Pasadena refinery. Costa and other Petrobras managers accepted bribes to approve the wildly inflated Houston purchase.

48.     A confidential informant whose testimony has been made public and who worked for a Petrobras affiliate in Houston, Texas during the relevant timeframe directly witnessed the corruption and bribery associated with Petrobras's gross overpayment for the Pasadena refinery. When the informant dared to speak up about what (s)he had witnessed and tried to prevent Petrobras's overpayment for the Pasadena refinery, (s)he was transferred from Texas to Brazil, and remained in limbo for three months without receiving any assignments at Petrobras's headquarters. While in Brazil, the informant was introduced to a top politician in the Workers' Party, who held a meeting with the informant, his/her friend, the politician, and the politician's assistant. The informant was later told by his/her friend that the politician had taken Pasadena refinery issue directly to Petrobras's then-President Gabrielli and to Rousseff, who was

then Brazil's Minister of Casa Civil. No action was taken and Petrobras went forward with the purchase of the Pasadena refinery. The informant worked at Petrobras through 2014 but was never again promoted.

(b)      <u>The Abreu & Lima Refinery</u>

49.     Another example of the bribery and kickback scheme involves the Abreu & Lima refinery in Pernambuco, whose costs skyrocketed from $4 billion to over $18 billion. According to a January 18, 2015 report in *Folha de S. Paulo*, much of the cost increase at the refinery was due to add-on-contracts awarded to the Cartel companies, which caused an estimated $3.2 billion in padded bids.

50.     In 2005, Petrobras approved plans to build the Abreu Refinery, one of Brazil's first new refinery projects in over 20 years. Costa, as director of the refining, transportation and marketing division, was primarily responsible for managing construction of the Abreu Refinery.

51.     In May 2009, amid rising costs, Brazil's opposition parties sought to create a Parliamentary Investigative Committee ("PIC") to investigate cases of corruption involving Petrobras, including overbilling contractors associated with the Abreu & Lima refinery. Petrobras was determined to prevent the investigation at all costs. Costa related the details of three meetings he attended with representatives from controlling political parties regarding investigations into the possible corruption surrounding construction of the Abreu Refinery. At the first meeting, Costa was told that an investigation was not in the interest of the controlling political parties or the nation. Costa recounted the details of that meeting to Gabrielli's Chief of Staff, who told Costa that Petrobras could not afford a scandal and that something must be done to stop the investigation. At the second meeting, a politician in attendance told Costa that he would help stop the investigation, but that his political party would need R$10 million to do so. Costa requested the bribe money from the President of a Cartel member working on the Abreu

16

& Lima Refinery, who agreed to pay the bribe.  At Costa's third meeting with the politicians, he informed them that he had secured the bribe money; Costa was later informed that the bribe money had been paid.

52.     Despite the bribe, the investigation was approved and installed in 2010—over the vehement opposition of the controlling political parties.  But the man selected to be President of the investigation and responsible for directing its efforts was one of the politicians from the controlling party who had been in the three meetings with Costa.  The investigation found that there were no irregularities with the Refineries and concluded that earlier audits finding irregularities were flawed.

(c)     The Comperj Project

53.     The Complexo Petroquimico do Rio de Janeiro ("Comperj") complex is an integrated refining and petrochemical complex that broke ground in 2008, began construction in 2010, and is scheduled to start up in 2015.  According to Brazil's National Accounting Court ("TCU"), Petrobras will spend 60 percent more than originally budgeted at one of its refineries. A TCU report found that Petrobras will pay $21.6 billion to complete Comperj.  The TCU found "discrepancies between different government agencies, as well as within different Petrobras divisions, over investment needed for Comperj."  The TCU also concluded that Petrobras's management had been "reckless with irregularities in the omission of technical analyses, overpaying for contracts and a lack of effective controls."  One member of the TCU commented that it was "investigating how the structure of Petrobras can undertake such a huge project in such a sloppy way."  The TCU found "irregularities in three contracts: two that were overpaid and one that was signed in an 'emergency' time-frame that didn't allow other companies to bid."

54.     The audit found excessive risk-taking and a disregard of standard operating procedures, causing significant effects on the timing and the cost of the project.  Contracts worth

17

$3.1 billion were given without bidding.  The audit warned that the project is threatening

Petrobras with heavy losses.  Additionally, the audit found a lack of clarity in disclosing the costs

of the project.

### 5. Petrobras's Senior Executives' Knowledge of the Scheme

55.     Countless Petrobras employees were involved in the scheme, and the

corruption reached to Petrobras's senior executives at the highest levels.  Youseff, the money

launderer whose dealings were the initial target of Operation Car Wash, claims that Brazilian

President Dilma Rousseff, who chaired the Petrobras board from 2003 to 2010, also knew about

the kickbacks.  Youseff was quoted in Forbes Magazine as saying that, "[t]he CEO of Petrobras

and the President understood the scheme."  Prosecutors are currently investigating at least 49

politicians from six political parties in connection with the scheme, including the heads of both

houses of Congress and a former energy minister.

56.     Petrobras' former manager of downstream operations, Venina Velosa da

Fonseca, testified under police protection that she met with Defendant Foster in 2008 and told

her about inflated contracts and payments for services that were not carried out.  Foster led the

energy and gas division at that time and reported to then-CEO Jose Sergio Gabrielli.  Fonseca

represented that "I met with the CEO personally when she was director of the gas and energy

unit.  At that time, we discussed the matter.  I handed over to her the documents about the

complaints.  Afterward, she had access to these anomalies at the management meetings."

Fonseca explained that it was not only via email that she warned Defendant Foster of

irregularities in Petrobras.  The former manager had a personal meeting with Foster when Foster

was director of Gas and Energy at Petrobras.  Fonseca said she handed documents to Foster

about the inflated contracts and related payments.  "Since 2008, I have been reporting these

problems to my superiors, culminating now I'm taking all this documentation to the prosecutor,"

18

Fonseca said.  Fonseca, who had reported internally for years regarding irregularities at

Petrobras, ended up being sent to Singapore and, last November 19, was dismissed from her job

in that country.  Prosecutors are pursuing an indictment against Gabrielli.

57.     Fonseca raised problems directly with Foster as well.  Reportedly, Fonseca last

e-mailed Foster on November 17, 2014.  Fonseca wrote that "[s]ince 2008, my life has become a

hell, I came across an initial scheme of embezzlement within the Communications of

Downstream [unit].  By fighting it, I was threatened and harassed.  I even had a gun pointed to

my head and received threats against my daughters . . . .  I have with me all the documentation of

the case, which I never offered to the press out of respect for Petrobras, despite all the

journalists' attempts of contacting.  I presented the matter to the company's competent

authorities, including the Legal and Audit [departments], which was in vain," she continued.

"Now, in Singapore, I came across other problems, such as cases involving the bunker area and

losses, and once again acted in favor of the company, trying to avoid acts against its interests

. . . .  I was not aware of actions taken in the second example cited, implying that there was

omission of those who were informed and could act."  Petrobras fired Fonseca just two days

later.

58.     Defendant Foster, a Petrobras employee since the 1970s who spent nearly her

entire career at Petrobras, moved up the Company's ranks rapidly during Rousseff's 2003-2010

stint as chairwoman of Petrobras' Board.  Throughout the years, Foster and Rousseff have had a

very cozy relationship.  Foster is said to be fiercely loyal to Rousseff.  Reportedly, Foster met

President Rousseff in the late 1990s when Rousseff was an energy official.  Rousseff eventually

became energy minister and turned Foster into one of her senior aides.  Two years later, Foster

returned to Petrobras.  When Rousseff took office in 2012, she immediately elevated Foster to

19

the top of Petrobras' totem pole.  At the Company's helm, Foster remains Rousseff's trusted
lieutenant.

59.     Foster has been intricately involved in Petrobras's operations and investments.
In 2012 and 2013, Foster told investors that she would "closely monitor[] the liquidity and
leverage limits established by [Petrobras's] Board of Directors, which are essential vectors for
insuring the financeability of [a Petrobras project]."  Executive Board meetings were held twice
weekly in order to focus on the physical and financial monitoring of the principal projects in the
Company's investment plan.  Foster represented to investors that she "constantly monitor[ed] the
progress of [Petrobras's] investment projects and structuring programs with the Directors,
Executive Managers, and all other leaders involved."

### D.     Petrobras's Admission of Inflated Asset Values

60.     On November 13, 2014, after the markets closed, Petrobras issued a press
release that acknowledged for the first time that the Company might need to write down asset
values (capitalized on its financial statements under PP&E) to eliminate fraudulently-incurred
bribery-related payments that should not have been capitalized.

61.     On November 17, 2014, Petrobras hosted a conference call for analysis and
investors.  During that call, the Company's CFO (Barbassa) stated:

> In light of the accusations and investigations of [O]peration Car
> Wash . . . Petrobras is not able to publish its 3Q14 financial
> statements because these accusations, if found to be true, could
> potentially affect the Company's financial statements.
>
> A determining fact took place on October 8, 2014, when the
> depositions of former Downstream Executive Director, Mr. Paulo
> Roberto Costa, and Mr. Alberto Youssef . . . revealed information
> that may lead to possible adjustments in the financial statements of
> our Company.
>
> Because of these depositions, therefore, *we need more time to
> make any possible adjustments to the financial statements.*  More

time is needed as well to gain greater understanding from the ongoing investigations by the independent law firms; and *we need more time as it is fundamentally important to improve our internal controls*.

62.     During the question-and-answer portion of the call, the following exchange

occurred between CFO Barbassa, CEO Foster, and an analyst:

> [**Analyst**]: [I]f we suppose[] . . . [BRL] 5 billion of overprice in the construction of [an asset], how would this be recognized in the balance sheet of the Company?  What are the main line items that would be impacted?

> **CFO Barbassa:** The adjustment that could be impacted if the accusations are proven to be true would refer to adjustments at fair price of the PP&E that was acquired. . . . In this case, *this value should be removed from PP&E line item [adjusted] value[.]*

> *        *        *

> **CEO Foster:** As for the amounts that we would be writing down in terms of our results, our official reference are the depositions made in court.  This was what the judges are calling evidence, temporary evidence.  So, in this case, we have a schedule of activities, and we have deadlines to each one of these activities.

> For example, there is definition of criteria to measure the effects of losses caused by fraud.  In here, *in the objective, in material fashion, our reference will be the depositions made so far*, the evidence provided that will be submitted to Petrobras by the federal police.  *We will then use this evidence to have our write-downs, and to the write-downs year after year* regarding companies A, B, C or D that we might have contracted.

63.     On April 22, 2015, Petrobras issued an interim condensed consolidated

statement of financial position, which was reviewed by PwC (which was filed with the SEC as

part of a 6-K filing on April 23, 2015).  In this filing, Petrobras admitted that the corruption

scandal caused the valuations of its assets to be improperly inflated and that writedowns

reflecting the true value of the assets were necessary, stating:

> [S]enior Petrobras personnel conspired with contractors, suppliers and others from 2004 through April 2012 to establish and

implement an illegal cartel that systematically overcharged the Company in connection with the acquisition of property, plant and equipment. . . . The overpayments were used to fund improper payments to political parties, elected officials or other public officials, individual contractor personnel, the former Petrobras personnel and other individuals involved in the payment scheme.

. . .

Petrobras believes that under IAS [International Accounting Standard] 16, ***the amounts it overpaid pursuant to this payment scheme should not have been included in the historical costs of its property, plant and equipment.***

64.     The Company then wrote off just over $2.5 billion of capitalized costs representing amounts that Petrobras overpaid for the acquisition of PP&E.

65.     The Company explained that it reached the write off amount by: (1) identifying the contractual counterparties that were members of the Cartel; (2) identifying contracts with the counterparties between 2004 and April 2012; (3) identifying the total contract values of those contracts; and (4) applying a fixed 3% to the total values of the contracts.

66.     Foster (then Petrobras's CEO) and most of Petrobras's Board had agreed on January 23, 2015 to take a net writedown of R$61.4 billion (approximately $22 billion) in the third quarter, but President Rousseff, through government-appointed board member, vetoed the proposal, saying it was too large.  A source in Brazil has told Reuters that "[e]ssentially the government didn't want the writedowns to be interpreted as totally related to corruption."

67.     The Company's massive writedown still grossly understates the size of the actual damage to the Company.  As discussed above, the scheme deprived Petrobras not just of the 3% that was earmarked specifically for bribes.  In addition to the bribe money, essentially all of Petrobras's contracts with Cartel members were inflated by up to approximately 20% over Petrobras's true estimated costs, resulting in increased expenditures by Petrobras and overstated values for PP&E.

22

68.     Moreover, the bribery scheme did not end in April 2012, but continued through 2014.  Costa has testified that after he left the Company in April 2012, he set up a consulting company, "Costa Global," in order to facilitate the payment of bribes relating to the Abreu Refinery and other contracts.  Costa admitted that Costa Global entered into an arrangement with Construtora Comercio Camargo Correa—which performed significant work at the Abreu Refinery throughout the Relevant Period—through which Costa received R$100,000 per month for 30 months through (approximately $1 million).

### E.     Petrobras's False and Misleading Financial Statements

69.     Petrobras's improper capitalization of bribery-related payments violated Generally Accepted Accounting Principles ("GAAP") and International Financial Reporting Standards ("IFRS") and led to its financial statements being materially false and misleading during the Relevant Period in at least three ways.  *First*, by improperly capitalizing its bribery-related payments, and then failing to conduct appropriate writedowns, Petrobras overstated the value of its property, plants and equipment, and the total value of its assets.  *Second*, because bribery-related payments should have been treated as operating expenses and deducted from net revenues rather than capitalized and depreciated over time, Petrobras's operating expenses were understated and its net income was overstated.  *And third*, because Petrobras calculated depreciation, depletion and amortization ("DD&A") expenses by reference to asset values that were inflated (as a result of both bribes and collusively overpriced contracts), Petrobras's DD&A expenses were inflated.

### 1.     2009-2010 – United States GAAP Violations

70.     Petrobras's Form 20-F annual reports for 2009 and 2010 stated that "[t]he audited consolidated financial statements of Petrobras and our consolidated subsidiaries . . . have

been presented in U.S. dollars and prepared in accordance with U.S. generally accepted accounting principles, or U.S. GAAP."

71.     Accounting Standards Codification ("ASC") 360 of GAAP requires that the carrying values of property, plants and equipment be measured initially at historical cost, including all normal expenditures necessary to bring the asset to a location and condition for its intended use.  GAAP does *not*, however, permit general administrative or overhead expenses to be included when capitalizing assets, because these costs do not give rise to any expectations of future profitability.  As discussed in paragraphs 60-68, however, during and prior to the Relevant Period, the Company improperly capitalized bribery-related payments and paid collusively-set contract prices that inflated the costs of the properties it acquired without in any way enhancing the values of the properties.  By doing so, Petrobras violated GAAP.

72.     GAAP also requires that a Company write down the values of its property, plants and equipment when events indicate that the carrying value of an asset or group of assets may not be recoverable.  ASC 360-10-35-17 provides that, "An impairment loss shall be recognized only if the carrying amount of a long-lived asset (asset group) is not recoverable and exceeds its fair value. . . . An impairment loss shall be measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds its fair value."

73.     Petrobras specifically represented that it was, in fact, carrying out reviews of its long-lived assets in order to determine whether writedowns were necessary and appropriate as required by GAAP.  The Company's Forms 20-F for 2009 and 2010 each stated that

> *In accordance with Codification Topic 360-10, management reviews long-lived assets, primarily property, plant and equipment to be used in the business and capitalized costs relating to oil and gas producing activities, whenever events or changes in circumstances indicate that the carrying value of an asset or group of assets may not be recoverable on the bases of*

*undiscounted future cash flows.* The reviews are carried out at the lowest level of assets to which the Company is able to attribute to identifiable future cash flows. *The net book value of the underlying assets is adjusted to their fair value using a discounted future cash flow model, if the sum of the expected undiscounted future cash flows is less than book value.*

The main assumptions of the cash flows are: prices based on last strategic plan presented, production curves associated to existent projects comprising the Company's portfolio, operating market costs and investments needed for projects conclusion.

74.     Petrobras knew that the carrying values of property, plants and equipment that had been impacted by bribery were not recoverable because those values had been inflated by fraud. Petrobras, however, failed to conduct appropriate writedowns to reflect this fact. As discussed in paragraphs 60-68, the Company has admitted that such writedowns in excess of $2.5 billion were necessary.

75.     Petrobras's practice of capitalizing bribery-related payments also caused its operating expenses to be understated and its net income to be overstated. GAAP provides that general and administrative expenses should be recorded as expenses, not capitalized, and Petrobras's Form 20-F for 2009 and 2010 each state that its operating expenses include "general and not administrative expenses." Thus, by capitalizing bribery-related payments rather than recording them as operating expenses, Petrobras understated its operating expenses. Because operating expenses are subtracted from net operating revenues in calculating net income (but capitalized expenses are not), the understatement of operating expenses caused net income to be overstated by a corresponding amount.

76.     Petrobras's inflated valuations of its property, plants and equipment also caused its DD&A to be overstated. Petrobras's Forms 20-F for 2009 and 2010 each stated that property, plant and equipment was depreciated on a straight line basis. Thus, the DD&A of each property that was affected by the bribery scheme was overstated to the degree that the property's

capitalized cost was inflated by bribery and collusively-set contract prices.  For example, if a particular refinery's cost was inflated by 20% as a result of bribery and kickbacks, then each year's DD&A for that refinery would have been overstated by 20% as well.

### 2.    2011-2014 – IFRS Violations

77.     Beginning with fiscal year 2011, Petrobras switched from the use of GAAP in its financial statements to IFRS.  Each of Petrobras's Form 20-F annual reports for 2011, 2012, 2013, and 2014 contained a statement to the effect that the Company's "consolidated financial statements have been prepared and are being represented in accordance with the International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board."

78.     Under IFRS, International Accounting Standard ("IAS") 16 governs the initial measurement of property, plant and equipment capitalization.  Certain relevant provisions of IAS 16 are listed below.

- IAS 16-7 provides that "[t]he cost of an item of property, plant and equipment shall be recognized as an asset if, and only if: (a) it is probable that future economic benefits associated with the item will flow to the entity; and (b) the cost of the item can be measured reliably."

- IAS 16-15 provides that "[a]n item of property, plant and equipment that qualifies for recognition as an asset shall be measured at its cost."

- IAS 16-16 provides that "[t]he cost of an item of property, plant and equipment comprises: (a) its purchase price, including import duties and non-refundable purchase taxes, after deducting trade discounts and rebates[; and] (b) any costs directly attributable to bringing the asset to the location and condition necessary for it to be capable of operating in the manner intended by management[.]"

- IAS 16-19(d) provides that "[e]xamples of costs that are not costs of an item of property, plant and equipment are: administration and other general overhead costs."

79.     Petrobras stated in its Form 20-F filings that it was following these rules.  Its 2011, 2012, and 2013 Forms 20-F each included language to the effect that, "[p]roperty, plant

and equipment, net is stated at the cost of acquisition or construction, which represents the costs incurred for bringing the asset to the condition for operation, adjusted during hyperinflationary periods, less accumulated depreciation and impairment losses."

80.     Because paying bribes and kickbacks to contractors, politicians, and Petrobras executives did not give rise to any future economic benefits that would flow to Petrobras, and because the costs of corruption, by their nature, cannot be measured reliably, the costs that Petrobras incurred by repaying bribes did not qualify for recognition as assets under IAS 16-7. Rather, they would fall under the category of general overhead costs, which IAS 16-19(d) specifies may **not** be capitalized.

81.     Furthermore, like GAAP, IFRS requires that capitalized items of property, plants or equipment be written down where there is evidence that the carrying value of those assets exceeds their fair value (*i.e.*, market value as determined by an appraisal).  Relevant portions of IAS 16 include:

- IAS 16-30: "After recognition as an asset, an item of property, plant and equipment shall be carried at its cost less any accumulated depreciation and any accumulated impairment losses."

- IAS 16-31: "After recognition as an asset, an item of property, plant and equipment whose fair value can be measured reliably shall be carried at a revalued amount, being its fair value at the date of the revaluation less any subsequent accumulated depreciation and subsequent accumulated impairment losses.  Revaluations shall be made with sufficient regularity to ensure that the carrying amount does not differ materially from that which would be determined using fair value at the end of the reporting period."

- IAS 16-32: "The fair value of land and buildings is usually determined from market-based evidence by appraisal that is normally undertaken by professionally qualified valuers.  The fair value of items of plant and equipment is usually their market value determined by appraisal."

- IAS 16-34: "The frequency of revaluations depends upon the changes in fair values of the items of property, plant and equipment being revalued.  When the fair value of a revalued asset differs materially from its carrying amount, a further revaluation is required . . . ."

82.     Regarding revaluation, Petrobras's 2011, 2012 and 2013 Forms 20-F each included language substantially identical to the below:

> **Property, plant and equipment and intangible assets with definite useful lives are assessed for impairment when there is evidence that the carrying amount may not be recoverable.**
>
> Assets related to exploration and development of oil and gas and assets that have an indefinite useful life, such as goodwill, are tested for impairment annually . . . .
>
> **Impairment test comprises a comparison of the carrying amount of a cash generating unit with its recoverable amount. Where the carrying amount of cash generating unit exceeds its recoverable amount, it is considered impaired and is written off to its recoverable amount.** Reversal of previously recognized impairment losses is permitted, except for goodwill.
>
> The recoverable amount of an asset or group of assets is the higher amount between its fair value less cost to sell and its value in use. Value in use is generally used by the Company for impairment testing purposes, except when specifically indicated.

83.     Petrobras violated IAS 16 by failing to write down to their market value those assets whose costs had been inflated by fraud. Petrobras knew that the fair value of its assets differed materially from their carrying values, and that to the extent its asset values had been inflated by bribery-related payments, that inflation was not recoverable. Nevertheless, the Company failed until April 2015 to take appropriate writedowns as required by IAS 16-30 and 16-31.

84.     Petrobras's practice of capitalizing bribery-related payments also caused its operating expenses to be understated and its net income to be overstated. As discussed above, IAS 16-7 prohibits the recognition of general and administrative expenses not likely to cause future economic benefits as capital assets. Rather, these expenses should be recorded as operating expenses under IAS 7 and included in the reporting entity's cash flow statement. Petrobras's Forms 20-F for 2011, 2012, and 2013 each state that its operating expenses include

"general and administrative expenses."  Thus, by capitalizing bribery-related payments rather than recording them as operating expenses, Petrobras understated its operating expenses. Because operating expenses are subtracted from net operating revenues in calculating net income (but capitalized expenses are not), the understatement of operating expenses caused net income to be overstated by a corresponding amount.

85.     As under GAAP, Petrobras's inflated property, plant and equipment valuations also caused its DD&A to be overstated.  Petrobras's Forms 20-F for 2011, 2012, and 2013 each contained a statement to the effect that, "[e]xcept for land, which is not depreciated, other property, plant and equipment are depreciated on a straight line basis."  Thus, again, the DD&A of each property that was affected by the bribery scheme was overstated to the degree that the property's capitalized cost was inflated by bribery and improperly, collusively-set contract prices.  For example, if a particular refinery's cost was inflated by 20% as a result of bribery and collusively-set contract pricing, then each year's DD&A for that refinery would have been overstated by 20% as well.

**F.     Petrobras's Accounting Firm's Willful Blindness of the Scheme**

86.     PwC reported that it conducted its audits in accordance with the standards of the U.S. Public Company Accounting Oversight Board ("PCAOB").[2]  In connection with its audits of Petrobras for the years ended December 31, 2013 and 2012, PwC failed to comply with PCAOB standards and SEC rules governing its conduct.  PwC turned a blind eye to Petrobras's systemic and pervasive scheme of overstating the Company's PP&E.

87.     *First*, PwC issued (1) an unqualified audit opinion dated February 25, 2014 on Petrobras's 2013 financial statements, which stated that the 2013 financial statements were

---

[2]   Congress established the PCAOB to oversee the audits of public companies.

presented in conformity with IFRS; and (2) an unqualified audit opinion dated February 4, 2013

on Petrobras's 2012 financial statements, which stated that the 2012 financial statements were

presented in conformity with IFRS.  PwC issued these clean opinions despite the fact that PwC

knew or recklessly disregarded the fact that the financial statements did not conform with IFRS

and did not present fairly, in all material respects: (1) the consolidated financial position of

Petrobras as of December 31, 2013 and 2012; (2) the results of Petrobras's statements of income

and comprehensive income for the years ended December 31, 2013 and 2012; (3) changes in

equity for the years ended December 31, 2013 and 2012; and (4) cash flows for the years ended

December 31, 2013 and 2012.  PwC also issued clean opinions despite the fact that PwC's audit

was not in accordance with PCAOB standards.  PwC assured investors that as part of its audit, it

obtained reasonable assurance that Petrobras's financial statements were free of material

misstatements.  PwC's assurances were false.

88.     *Second*, PwC certified that Petrobras maintained, in all material respects,

effective internal control over financial reporting for the years ended December 31, 2013 and

2012.  These assurances were also false.

### 1.     Red Flags That PwC Ignored Before Its Clean Reports

89.     In its audits for the years ended December 31, 2013 and 2012, PwC ignored the

following red flags:

- In June 2012, Petrobras conducted an internal audit, which revealed highly inflated cost estimates for the Abreu and Lima Refinery.  The audit revealed increased estimated costs, which had skyrocketed from $1.8 billion to $18.8 billion.  Much of the cost increases were due to add-on contracts awarded to Cartel companies, which in turn resulted in an estimated $3.1 billion loss in padded bids.  The report blamed ex-Director Paulo Roberto Costa for modifying the original plan to add unnecessary features.  Despite knowledge of the increased costs, the Petrobras Board of Directors approved the unnecessary additions, resulting in further kickbacks to political parties and directors.

- The June 2012 audit also uncovered unsubstantiated charges for communications services at the Abreu and Lima Refinery that never were provided. Additional evidence collected by Fonseca, who was involved in the Refinery's construction, found millions of dollars for contracts for which no service was provided. The most significant evidence, however, was of the kickback scheme. Fonseca stated that she found a pattern indicating the contractors were rigging bids and overbilling by up to 20% of estimates.

- In November 2012, Bloomberg reported that, according to the Brazilian news magazine Veja, the Brazilian federal prosecutor was looking into Petrobras's $1.1 billion acquisition of the Pasadena Refinery. It was reported that Delta Airlines purchased a similar refinery for only $150 million. As described above in paragraphs 47-48, Petrobras acquired the Pasadena Refinery for over $1 billion in 2006. Astra (from whom Petrobas purchased the refinery) had purchased it just one year earlier for only $42.5 million. According to informants, the Pasadena Refinery was not modern or a very productive refinery. It is highly unlikely that the refinery increased in market value by more than 2,000% in a one-year time span.

- Petrobras's capital expenditures in 2012 and 2013 were approximately four times greater than Petrobras's net income in those years.

- Petrobras had a number of large constructions severely over budget.

### 2.    Red Flags That PwC Ignored Following Issuance of Its Clean Reports

90.    PCAOB standards, including Interim Standard ("AU") 530.03-04, require an auditor to consider the effect on its opinion of events occurring after the date of the auditor's report, but before the report is issued. Petrobras filed PwC's report for the year ended December 31, 2013 with the SEC on April 30, 2014. Between February 25, 2014 and April 30, 2014, numerous events occurred to put PwC on further notice of potential misrepresentations:

- On March 12, 2014, it was reported that Brazilian lawmakers assembled a committee to investigate alleged kickbacks made to Petrobras by the Dutch firm SBM Offshore, a company that leases floating oil platforms and vessels.

- On March 17, 2014, Petrobras issued a press release announcing that the Company's Board had approved the Company's financial statements for 2013 by a majority vote. The announcement, however, noted:

> Director Mauro Rodrigues da Cunha **voted against the approval of the Financial Statements** of Petrobras due to: (i) lack of timely dispatch of the

31

financial statements to the Directors to analyze;
(ii) disagreement with the hedge accounting policy;
and (iii) **lack of information and apparent
accounting inadequacy of refinery investments.**

- On or about March 17, 2014, the Brazilian federal police publicly launched Operation Car Wash, which focused on a scheme run by black-market money dealers who were thought to have illegally transferred and laundered approximately $3.8 billion using, among other things, the purchase and sale of luxury automobiles.  As part of the operation, several days later, the Brazilian federal police arrested Costa, a former senior executive of Petrobras, based on documentation linking Costa to the receipt of a luxury automobile from another individual implicated in the money laundering scheme.

- On April 15, 2014, Petrobras's then-CEO Foster appeared before the Brazilian Senate to testify about the Company's purchase of the Pasadena Refinery and allegations of bribery.  As part of her statement, Foster revealed that Petrobras was re-evaluating all contracts in which Costa may have participated.

91.     These red flags should have immediately put PwC on notice that there was a substantial risk that Petrobras was involved in illegal acts and that there was a high likelihood that its financial statements included material misstatements.  Thus, PCAOB standards required PwC to heighten its audit procedures and, ultimately, to retract its audit opinion.  PwC failed to do so.

### 3.     PwC's Failure to Comply with Governing Standards

(a)     <u>Violations of PCAOB Reporting Standards, General Standards, and Standards of Field Work</u>

92.     PwC violated PCAOB auditing standards and Section 10A audit requirements of the Exchange Act in the conduct of its audit in the following ways:[3]

---

[3]   The foundation of the PCAOB standards rests on ten broad standards which provide a measure of audit quality and objectives to be achieved in an audit.  These audit standards include three general standards about the qualifications of the auditor, the auditor's independence, and the quality of the auditor's work; three standards of field work about how the audit should be conducted; and four reporting standards about the requirements of the auditor's report.  *See* AU 150.01-02.  The PCOAB standards that have been adopted by the PCAOB and approved by the SEC are referenced with the symbol ("AS") in the prefix and for standards that have been

(a)     PwC violated PCAOB Standard of Reporting No. 1, which requires the auditor to attest to whether the Financial Statements are presented in accordance with GAAP.[4]  PwC falsely represented that Petrobras's Financial Statements were presented in conformity with IFRS when they were not for the reasons herein alleged, and as evidenced by the pending write-down of up to $30 billion of Petrobras' PP&E;

(b)     PwC violated PCAOB Standard of Reporting No. 4, in that PwC improperly expressed unqualified opinions on Petrobras' financial statements for the years ended December 31, 2013 and 2012 even though its audits were not conducted in accordance with PCAOB standards and the financial statements were not prepared in accordance with IFRS;

(c)     PwC failed to consider the effect on its opinion of events occurring after the date of the auditor's report but before the report is issued.  *See* AU 530.03-04.

(d)     PwC violated PCAOB General Standard No. 3, which requires that due professional care is to be exercised in the performance of the audit and the preparation of the report;

(e)     PwC violated PCAOB Standard of Fieldwork No. 3, which requires sufficient appropriate evidential matter to afford a reasonable basis for: (1) the opinion regarding the financial statements; (2) the opinion regarding internal control over financial reporting; and

(f)     PwC violated Section 10A(a)(1) of the Exchange Act in that PwC failed to plan and perform audit procedures designed to provide reasonable assurance of detecting illegal acts having direct and material effect on the determination of financial statement amounts.

(b)     Due Professional Care and the Exercise of Professional Skepticism

93.     PwC violated AU Section 230, *Due Professional Care in the Performance of Work*, because it failed to perform its work with the requisite amount of due care:  "Due professional care imposes a responsibility upon each professional within an independent auditor's organization to observe the standards of field work and reporting."  Through the exercise of due care, PwC was required to obtain reasonable assurance that the financial

---

adopted by the PCAOB as preexisting interim standards are shown with the symbol ("AU") in the prefix.

    [4]   The first standard of reporting only makes reference to GAAP, but Petrobras issued its financial statements in accordance with IFRS.  The first standard of fieldwork still applies.

statements were free from material misstatement, whether caused by error or fraud. *See* AU 230.10. PwC failed to do this.

94. PwC also failed to exercise the required amount of professional skepticism. PCAOB standards required PwC to increase its level of professional skepticism once it became aware that there could be a misstatement due to fraud. PwC was required to be alert continually for indications of misstatements of Petrobras's financial statements whether due to error or fraud. With respect to the risk of fraud, the PCAOB standards require the auditor to approach the audit "with a mindset that recognizes the possibility that a material misstatement due to fraud could be present . . . ." *See* AU 316.13. PwC knew or should have known that there was a strong possibility of fraud in connection with Petrobras's financial statements for the 2012 and 2013 years for the reasons set forth above. AU 316.13, *Consideration of Fraud in a Financial Statement Audit*, states the following regarding exercising professional skepticism:

> Due professional care requires the auditor to exercise professional skepticism. *See* AU 230.07-09, *Due Professional Care in the Performance of Work*. Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the fraud risks. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. . . . Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

(c)   Responses to the Risk of Material Misstatement

95. PwC violated AS 13, *The Auditor's Responses to the Risk of Material Misstatement*, which required PwC to respond to the risk of a material misstatement in Petrobras's financial statements once PwC became aware that there was a heightened fraud risk in connection with bribes, kickbacks and the inflation of construction contracts. PwC was

required to perform increased audit procedures than it otherwise would have performed.  For

example, paragraphs 6 and 9a of AS 13 state the following:

> The auditor also should determine whether it is necessary to make pervasive changes to the nature, timing, or extent of audit procedures to adequately address the assessed risks of material misstatement.  Examples of such pervasive changes include modifying the audit strategy to: (a) increase the substantive testing of the valuation of numerous significant accounts at year end because of significantly deteriorating market conditions, and (b) obtain more persuasive audit evidence from substantive procedures due to the identification of pervasive weaknesses in the company's control environment. . . .

> In designing the audit procedures to be performed, the auditor should: (a) obtain more persuasive audit evidence the higher the auditor's assessment of risk.

96.     Paragraph 14 of AS 13 provides specific examples of how PwC should have

modified its audit procedures to address its assessed fraud risks:

> The following are examples of ways in which planned audit procedures may be modified to address assessed fraud risks:

> a.     Changing the *nature* of audit procedures to obtain evidence that is more reliable or to obtain additional corroborative information;

> b.     Changing the *timing* of audit procedures to be closer to the end of the period or to the points during the period in which fraudulent transactions are more likely to occur; and

> c.     Changing the *extent* of the procedures applied to obtain more evidence, *e.g.*, by increasing sample sizes or applying computer-assisted audit techniques to all of the items in an account.

### (d)     PwC's Failure to Detect Illegal Acts

97.     PwC failed to detect Petrobras's illegal acts including bid-rigging, bribery, and

kickbacks.  PwC should have recognized the importance of PP&E to the balance sheet and that

the most significant cash outflow was capital expenditures.  The capital expenditures in 2012 and

2013 were approximately four times greater than net income.  There also were projects that were

severely over budget.  In accordance with AU 317, *Illegal Acts by Clients*, PwC was required to

perform certain additional procedures when it became aware of information concerning a

possible illegal act.  PwC was required to gain an understanding of the nature of the act, the circumstances in which it occurred, and other information to evaluate the effect on the financial statements.  Pursuant to AU 317.10, if Petrobras management failed to provide the information to PwC about the nature of the illegal act, PwC was required to consult with the Petrobras' legal counsel or other specialists.  In addition, AU 317.11 suggests the following additional audit procedures PwC should have undertaken "(a) examining supporting documents; (b) confirming significant information concerning the matter; (c) determining whether the transaction has been properly authorized; [and] (d) considering whether other similar transactions or events have occurred, and apply procedures to identify them."  AU 317.11.  PwC did not undertake any of these actions.

98.    In addition, PwC violated the requirements of Section 10A of the Exchange Act, which requires auditors of public companies to design procedures to provide assurance of detecting illegal acts.  PwC failed to design or enact procedures that would provide reasonable assurance that it would detect illegal acts having a direct material effect on the determination of financial statement amounts.  Section 10A of the Exchange Act requires an auditor to notify the SEC if it becomes aware of information indicating that an illegal act has or may have occurred, unless the company's management or Board takes appropriate remedial actions.  PwC knew or recklessly ignored that it failed to meet this standard in the performance of its "audits" of Petrobras in 2012 and 2013.

(e)    PwC's Failure to Obtain Sufficient Evidence in its Audits of PP&E

99.    Auditing Standard 15.5, *Audit Evidence*, states that "as the risk [of misstatements] increases, the amount of evidence that the auditor should obtain also increases . . . . [;] ordinarily more evidence is needed to respond to significant risks."  PwC failed to obtain sufficient evidence regarding its audits of Petrobras's capital expenditures, construction in

progress accounts, and equipment and other assets accounts.  As explained above, indicators of risk included excessive payments by the Company to acquire certain refineries, significant budget overruns on large projects, and press reports accusing the Company of engaging in bribes and kickbacks.  If PwC had modified its audit procedures appropriately to be responsive to the risk of material misstatements regarding PP&E in the Company's financial statements, and if PwC had carried out these procedures with the appropriate degree of professional skepticism, it likely would have discovered that the Company's capital expenditures, PP&E, and Net Income were materially overstated.

100.    Pursuant to AS 15.25 and AU 316.58, the audit procedures that PwC was required to perform included the following:

- Physically inspecting major additions and verifying claims of ownership;

- For constructed property and construction in progress, examining appropriate documentation supporting the amount recorded on the Company's balance sheet, such as review of construction contracts, work orders, and job status reports;

- Verifying that all payments for capital expenditures were properly authorized and included appropriate supporting documentation;

- Verifying that change orders went through the proper approval process and that the resulting payments were appropriately authorized;

- Obtaining support for authorization of fixed assets additions by reference to minutes of meetings of the board of directors, capital asset budgets, or other evidence of approval by appropriate personnel;

- In connection with the assets under construction, examining all of the supporting documentation for large expenditures, and understanding why certain projects were exceeding their original budgeted amounts and why there were large add-on contracts that increased the original plans;

- Examining journal entries and other adjustments for evidence of possible material misstatement due to fraud; and

- Inquiring of individuals involved in the financial reporting process about inappropriate or unusual activity relating to the processing of journal entries and other adjustments.

101.   PwC violated PCAOB standards by failing to apply some or all of the above procedures.

(f)   <u>Internal Controls</u>

102.   PwC falsely certified that Petrobras maintained, in all material respects, effective internal control over financial reporting for the years ending December 31, 2013 and 2012.  PwC failed to obtain sufficient evidence supporting this certification, and it should have reported material weaknesses in Petrobras's internal controls.

103.   PwC failed to identify an internal control at Petrobras that was effective in preventing or detecting a material misstatement caused by the overstatement of PP&E in Petrobras's financial statements.  Absent the identification of internal controls, and testing of whether they could effectively address the risk of overstated PP&E values caused by the Company's bribery and kickback scheme, PwC should have reported a material weakness in Petrobras's internal controls.

104.   AS 5, *An Audit of Internal Control over Financial Reporting That Is Integrated with an Audit of Financial Statements*, requires auditors to audit management's assessment of the effectiveness of a company's internal controls over financial reporting.  Like AS 5, AU 325.4, *Communications About Control Deficiencies in an Audit of Financial Statements*, required PwC to communicate in writing to Petrobras management and to the audit committee all material weaknesses identified during the audit of Petrobras's internal controls.  PwC failed to do this.

V.      **EXCHANGE ACT**

A.      **Overview of Claims**

105.    Plaintiffs' claims arise from a litany of false statements of material fact and omissions of material adverse information made by Defendants throughout the Relevant Period concerning both quantitative and qualitative matters including: (1) the value of Petrobras's assets; (2) the Company's periodic expenses and net income; (3) the Company's anti-bribery and anti-corruption policies; and (4) whether the Company suffered from material weaknesses in its disclosure controls and procedures and internal controls over financial reporting.  These misstatements spanned many years, permeating the market, and obfuscating reality.   The false and misleading statements chronicled below are merely an example of Petrobras's countless, repeated false statements and material omissions.  When the Company issued a series of corrective disclosures that revealed the truth about these matters, the market value of the Petrobras ADSs purchased by Plaintiffs declined sharply, causing Plaintiffs to suffer losses.

B.      **False and Misleading Statements**

106.    In response to investigations into the overpricing of Petrobras's contracts, Petrobras enacted a multi-faceted plan to deny any allegations of wrongdoing and to assure the market that there was no political interference in Petrobras's operations.  Among other initiatives, Petrobras created an official website entitled "Fados e Datos" ("Facts and Data") that was linked to Petrobras's corporate webpage.  Petrobras heralded the Facts and Data website as a "landmark" in establishing new means of communication with the Company's stakeholders, and said the website was created to give transparency to Petrobras's processes.

107.    In a January 28, 2010 post to the Facts and Data website, Petrobras "reiterate[d] that there have been no irregularities in contracts referring to the works of the Abreu e Lima Refinery [and] in the construction of  . . . Comperj."

108.    On January 29, 2010 Petrobras posted on the Facts and Data website that it "reaffirms that there has been no 'overbilling' or 'overpricing' in the Abreu [] refinery."

109.    The January 28 and 29, 2010 posts to the Facts and Data website were false and misleading due to their omission of any mention of the bribery scheme and its effect of inflating Petrobras's costs, including with respect to the Abreu e Lima Refinery and the Comperj project.

110.    On March 24, 2010, the Company issued a press release announcing its financial results for 2009.  The Company reported that as of December 31, 2009, it had net property, plant, and equipment of $136 billion, total assets of $200 billion, total costs and expenses of $70 billion (including depreciation, depletion, and amortization of $7.1 billion), and net income of $15.5 billion.

111.    The same day, Petrobras hosted an analyst conference call.  As part of his prepared remarks, then-CEO Gabrielli stated, in part, (translated from Portuguese):

> *In downstream, we invested in 2009 BRL17.3 billion.*  Most of the investment, 34% was in fuel quality, which is that we are increasing our capacity for reducing sulfur emission in our gasoline and diesel, trying to meet the environmental requirements of Brazil.
>
> *            *            *
>
> Also, we had a very important cost reduction efforts.  We operate in several areas.  We changed our bidding process.  *We divide the packages and different suppliers in such a way that we could get more competitive bids.*  We standardized more of our projects.

Later, Gabrielli discussed the Abreu and Lima Refinery with an analyst:

> [**Analyst**]: [O]n the refining CapEx, *I'd like to understand why for instance the Abreu and Lima refinery is estimated to have a cost that is twice as much the cost of a refinery of similar complexity in the US or Europe?*  I might be missing something, so I just wanted to understand if maybe it is related to infrastructure or something else, and maybe even the Maranhão

and Ceará refineries seem to be a bit higher in terms of cost versus the international benchmark.  So these are my two questions.  Thank you.

**Gabrielli**: First, we have very little flexibility for 2010 because most of the investment for 2010 is already ongoing investments that we have the contracts.  We have to deal with this reality which means that we need the capitalization in 2010.  That is a very important thing to highlight.  We need the capitalization in 2010.  If we are going to have a capitalization with the transfer of rights, production rights, or not is another thing, but we need the capitalization for 2010, That is a very important thing.

We are working right now with the hypothesis that we are going to have the capitalization with the transfer of rights for production from the Government.  But we have to consider also the possibility of not to have the transfer, That is the first thing.

The second thing is on the refinery costs, we are finishing the numbers.  If you have the numbers, please tell me because we have not finished it, we do not have them.

[**Analyst**]: We got the numbers from what the global press said and from what local reports from what the TCU indicates.

**Gabrielli**: Ok, if you have them, which is another thing.  But we are finishing  the numbers and for sure that is something that we have to take into consideration on a qualitative basis.  For example, most of the assessment of the cost of refineries is a kind of plug-and-play refinery in which you go, produce the refinery, and plug to the infrastructure and this is it.  This is not our case.

    112.    The March 24, 2010 press release and analyst conference call statements were

false and misleading because (1) Petrobas claimed asset valuations materially overstated due to

the improper inclusion of bribery-related payments to contractors and others in the recorded

value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses

were also overstated as a result of the bribery-related asset value overstatements; and

(3) Petrobras's stated net income failed to account for the bribery-related asset value

overstatements.  In addition, Gabrielli's statements regarding (1) the Company's property, plant

and equipment investments; (2) the Company's bidding processes; and (3) the high cost of the

Abreu and Lima Refinery were materially false and misleading due to his omission of any

mention of the bribery scheme and its effect of inflating Petrobras's costs.

113.   On May 20, 2010, Petrobras filed the 2009 Form 20-F with the SEC, which set

forth substantially similar figures as in the March 24, 2010 press release.  The 2009 Form 20-F

also included the following certification signed by Gabrielli that Petrobras's internal controls

over financial reporting were effective:

> I, José Sergio Gabrielli de Azevedo, certify that:
>
> 1.  I have reviewed this annual report on Form 20-F of Petróleo Brasileiro S.A. – PETROBRAS (the "Company");
>
> 2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;
>
> 4.  The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting, (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:
>
> (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial

statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.  The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

114.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses were overstated as a result of the bribery-related asset value overstatements; (3) Petrobras's stated net income failed to account for the bribery-related asset value overstatements; and (4) Petrobras's internal controls over financial reporting were not effective.

115.    On May 27, 2010, Petrobras issued a press release announcing its financial results for the first quarter of 2010.  The Company reported that as of March 31, 2010, it had net property, plant, and equipment of $141 billion, total assets of $204 billion, total costs and expenses of $21.3 billion, including depreciation, depletion, and amortization of $2.0 billion, and net income of $4.3 billion.

116.    These statements were materially, false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses were overstated as a result of the bribery-related asset value overstatements; and (3) Petrobras's stated net income failed to account for the bribery-related asset value overstatements.

117.    On August 24, 2010, Petrobras issued a press release announcing its results of operations for the second quarter of 2010.  The Company reported that as of June 30, 2010; it had net property, plant and equipment of $147 billion, total assets of $211 billion, total costs and expenses of $23.4 billion, including depreciation, depletion, and amortization of $2.1 billion, and net income of $4.2 billion.

118.    In a letter to shareholders and investors released together with the August 24, 2010 press release, Gabrielli stated:

> We are passing through an exceptional time in our history.  In the first six months of 2010 *we invested a record amount of US$19,387 million, 35.8% more than the same period last year, primarily allocated to increasing oil and gas production capacity, modernizing and expanding our refineries and reorganizing our interests in the petrochemical sector*, particularly in regard to Braskem.
>
> This substantial increase in capital expenditures is a reflection of the number and quality of projects in our investment portfolio as reflected in the expansion of our strategic business plan.  In June,

> we released the 2010-2014 Business Plan, in which we project
> investment spending of U.S. $224 billion, or approximately U.S.
> $45 billion per year.

119.    On August 25, 2010, Petrobras filed a Form 6-K with the SEC containing the

Company's financial statements for the six-month period ended June 30, 2010 which set forth

substantially similar figures as in the August 24, 2010 press release.

120.    These statements were materially false and misleading because (1) Petrobras's

claimed asset valuations were materially overstated due to the improper inclusion of bribery-

related payments to contractors and others in the recorded value of certain assets; (2) Petobras's

stated depreciation, depletion and amortization expenses were overstated as a result of the

bribery-related asset value overstatements; and (3) Petrobras's stated net income failed to

account for the bribery-related asset value overstatements.  In addition, Gabrielli's statements in

the shareholder letter were false and misleading due to his failure to reveal that bribery-related

expenses were a significant factor contributing to the growth of the Company's capital

expenditures.

121.    In an October 8, 2010 post to the Facts and Data website in response to an

article reporting that the TCU found overbilling in Petrobras's works in Rio, Petrobras insisted

that "there are no irregularities in the contracts of . . . Comperj," "there is no overbilling" at

Comperj, and that Petrobras had strictly observed competitive bidding mandates governing the

Company's business.

122.    These statements were materially false and misleading due to their omission of

any mention of the bribery scheme and its effect of inflating Petrobras's costs, including with

respect to the Comperj project.

123.    In a November 9, 2010 post to the Facts and Data website in response to TCU

allegations that contracts on refineries, including the Abreu and Lima Refinery, were overpriced

by billions of dollars, Petrobras asserted that it "denies that there have been irregularities in the works of the . . . Abreu e Lima (Rnset) refiner[y]."

124.    This statement was materially false and misleading due to its omission of any mention of the bribery scheme and its effect of inflating Petrobras's costs, including with respect to the Abreu and Lima Refinery.

125.    On November 23, 2010, Petrobras issued a press release announcing its results of operations for the third quarter of 2010.  The Company reported that as of September 30, 2010, it had net property, plant, and equipment of $206 billion, total assets of $298 billion, total costs and expenses of $25.1 billion including depreciation, depletion, and amortization of $2.1 billion, and net income of $4.7 billion.  In connection with these results, Gabrielli stated in part: "The success of our Global Offering was due to the confidence of our shareholders and investors, the Company's excellent reputation in the capital markets and ***our commitment to transparency*** and investor returns."

126.    On November 24, 2010, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the nine-month period ending September 30, 2010 with figures substantially similar to those set forth in the Company's November 23, 2010 press release.

127.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset value overstatements; (3) Petrobras's stated net income failed to account for

the bribery-related asset value overstatements; and (4) Petrobras's internal controls over financial reporting were not effective.

128.     On March 15, 2011, Petrobras issued a press release announcing its results of operations for the fourth quarter and full year of 2010.  The Company reported that as of December 31, 2010, it had net property, plant, and equipment of $219 billion, total assets of $309 billion, total cost and expenses of $96 billion including depreciation, depletion, and amortization of $8 5 billion, and net income of $19.2 billion.

129.     In connection with these results, Gabrielli stated in part:

> ***Our results*** for the fourth quarter and full year of 2010 further underscore our capacity for overcoming challenges, as well as ***emphasize the quality of our assets*** and investment projects.
>
> ***At Petrobras, we are fully aware that our achievements would not have been possible without the adoption of good corporate governance practices***, as well as investments in technology and workforce training.

130.     These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset value overstatements; (3) Petrobras's stated net income failed to account for the bribery-related asset value overstatements; and (4) Petrobras's internal controls over financial reporting were not effective.

131.     On May 24, 2011, Petrobras issued a press release announcing its results of operations for the first quarter of 2011.  The Company reported that as of March 31, 2011, it had net property, plant, and equipment of $230 billion, total assets of $331 billion, total costs and

expenses of $25.2 billion including depreciation, depletion, and amortization of $2.3 billion, and net income of $6.5 billion.

132.    On May 26, 2011, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the first quarter of 2011, which set forth substantially similar figures as in the May 24, 2011 press release.

133.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset value overstatements; and (3) Petrobras's stated net income failed to account for the bribery-related asset value overstatements.

134.    On May 26, 2011, Petrobras filed the 2010 Form 20-F, which set forth substantially similar figures as in the March 15, 2011 press release.  The 2010 Form 20-F also included certifications substantially similar to those described in paragraph 113, certifying that Petrobras's internal controls over financial reporting were effective.  Petrobras stated in the 20-F that the "Company's management assessed the effectiveness of each Company's internal control over financial reporting as of December 31, 2010" and "has concluded that as of December 31, 2010, each Company's internal control over financial reporting is effective."  The Company explained that the "management of [the] Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2010, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

135.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-

48

related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset value overstatements; (3) Petrobras's stated net income failed to account for the bribery-related asset value overstatements; and (4) Petrobras's internal controls over financial reporting were not effective.

136.   On or about June 6 2011, Petrobras published its 2010 Sustainability Report on its website.  This document stated that "Petrobras does not make contributions to political parties or political campaigns of candidates to elected positions" and that "[t]his company does not use child or slave labor, it is not involved in prostitution or sexual exploitation of children or adolescents, ***and it is not involved in corruption***."

137.   These statements were false and misleading because Petrobras was contributing money to Workers' Party officials and other politicians and political parties, and was involved in an ongoing, multi-billion dollar bribery scheme.

138.   On August 14, 2011, Petrobras issued a press release announcing its results of operations for the second quarter of 2011.  The Company reported that as of June 30, 2011, it had net property, plant, and equipment of $247 billion, total assets of $351 billion, total costs and expenses of $31.2 billion including depreciation, depletion, and amortization of $2.5 billion, and net income of $6.6 billion.

139.   On August 15, 2011, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the second quarter of 2011 which set forth substantially similar figures as in the August 14, 2011 press release.

140.   These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-

related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation depletion and amortization expenses were also overstated as a result of the bribery-related asset value overstatements; and (3) Petrobras's stated net income failed to account for the bribery-related asset value overstatements.

141.    In an August 15, 2011 post to the Facts and Data website, Petrobras stated that "in regard to material 'suspect donations' published in the edition No. 2179 by Istoe, Petrobras vehemently repudiates the insinuation of political favoritism toward the enterprise Jarague Equipamentos Industriais Ltda. or any other enterprise supplying the Company." The post also reiterated that Petrobras followed strict bidding procedures.

142.    These statements were materially false and misleading due to (1) their omission of any mention of the bribery scheme and its effect of inflating Petrobras's costs; and (2) their failure to disclose that Petrobras was contributing money to Workers' Party officials and other politicians and political parties as part of its ongoing, multi-billion dollar bribery scheme.

143.    In a November 8, 2011 post to the Facts and Data website, Petrobras stressed "that there has not been overbilling, overpricing, or any other irregularity in its works."

144.    This statement was materially false and misleading due to its omission of any mention of the bribery scheme and its effect of inflating Petrobras's costs.

145.    On November 22, 2011, Petrobras issued a press release announcing its results of operations for the third quarter of 2011. The Company reported that as of September 30, 2011, it had net property, plant, and equipment of $220 billion, total assets of $309 billion, total costs and expenses of $31.5 billion including depreciation, depletion, and amortization of $2.6 billion, and net income of $3.9 billion.

146.     Also on November 22, 2011, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the third quarter of 2011, which set forth substantially similar figures as in the November 22, 2011 press release.

147.     These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset value overstatements, and (3) Petrobras's stated net income failed to account for the bribery-related asset value overstatements.

148.     On February 28, 2012, Petrobras issued a press release announcing its results of operations for the fourth quarter and full year of 2011.  The Company reported that as of December 31, 2011, it had net property, plant and equipment of $182 billion, total assets of $319 billion, total costs and expenses of $19 billion including depreciation, depletion, and amortization of $10.5 billion, and net income of $20 billion.

149.     On February 29, 2012, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for 2011, which set forth substantially similar figures as in the February 28, 2012 press release.

150.     These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset value overstatements; and (3) Petrobras's stated net income failed to account for the bribery-related asset value overstatements.

151.    On April 2, 2012, Petrobras filed the 2011 Form 20-F, which set forth substantially similar figures as in the February 28, 2012 press release.  The 2011 Form 20-F also included certifications substantially similar to those described in paragraph 113, signed by CEO CEO Foster and CFO Barbassa, certifying that Petrobras's internal controls over financial reporting were effective.

152.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset value overstatements; (3) Petrobras's stated net income failed to account for the bribery-related asset value overstatements; and (4) Petrobras's internal controls over financial reporting were not effective.

153.    On May 15, 2012, Petrobras issued a press release announcing its results of operations for the first quarter of 2012.  The Company reported that as of April 30, 2012, it had net property, plant, and equipment of $194 billion, total assets of $338 billion, total costs and expenses of $4.7 billion including depreciation depletion, and amortization of $2.7 billion, and net income of $5.3 billion.

154.    On May 17, 2012, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the first quarter of 2012, which set forth substantially similar figures as in the May 15, 2012 press release.

155.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's

stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset value overstatements; and (3) Petrobras's stated net income failed to account for the bribery-related asset value overstatements.

156.    On or about June 21, 2012, Petrobras published its 2011 Sustainability Report on its website.  This document included the following statements about the anti-corruption policies of the "Petrobras System," i.e., Petrobras and its subsidiaries, affiliates, and associated companies (among others):

> **The Petrobras System refuses any practice that involves corruption or bribery**, and uses management instruments such as the Competition Behavior and Good Practice codes, in addition to following the Code of Conduct of the High Federal Administration, the application of which is inspected by the Presidency of the Republic's Ethics Commission.
>
> *   *   *
>
> According to its Code of Ethics guidelines, the Petrobras System makes no contributions to political parties or to candidates for elective offices.  The company's business requires transparency in actions and positions, particularly regarding the information published to society.
>
> *   *   *
>
> To ensure transparency in its relations with the Government, **Petrobras System's Code of Ethics determines the company will not make contributions to political parties or to campaigns of candidates to elected office.  It also emphasizes that it refuses any act of corruption and bribery** and that it has formal control and consequence procedures in place-o handle any breaches occurring within the company.
>
> *   *   *
>
> The company does not use child or slave labor, it is not involved in prostitution or sexual exploitation of children or adolescents or **corruption**.

157.   These statements were false and misleading because Petrobras was contributing money to Workers' Party officials and other politicians and political parties, and was involved in an ongoing, multi-billion dollar bribery scheme.

158.   On August 3, 2012, Petrobras issued a press release announcing its results of operations for the second quarter of 2012.  The Company reported that as of June 30, 2012 it had net property, plant, and equipment of $185 billion, total assets of $311 billion, total costs and expenses of $10.2 billion including depreciation, depletion and amortization of $5.3 billion, and net income of $4.3 billion.  In connection with these results, Foster stated in part:  "The new [Business and Management] Plan focuses on oil and gas production in Brazil and is underpinned by realism, precise targets and rigorous project management with capital discipline."

159.   On August 10, 2012, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the second quarter of 2012, which set forth substantially similar figures as in the August 3, 2012 press release.

160.   These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset value overstatements; (3) Petrobras's stated net income failed to account for the bribery-related asset value overstatements; and (4) Petrobras's internal controls over financial reporting were not effective.

161.   On October 26, 2012 Petrobras issued a press release announcing its results of operations for the third quarter of 2012.  The Company reported that as of September 30, 2012, it had net property, plant, and equipment of $191 billion, total assets of $318 billion, total costs and

expenses of $5.7 billion including depreciation, depletion, and amortization of $2.6 billion, and net income of $2.8 billion.

162.    On October 30, 2012, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the third quarter of 2012, which set forth substantially similar figures as in the October 26, 2012 press release.

163.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset value overstatements; and (3) Petrobras's stated net income failed to account for the bribery-related asset value overstatements.

164.    In a December 29, 2012 post to the Facts and Data website, Petrobras represented that "all the activities of Petrobas and its employees are fully oriented by principles of ethics and transparency.  The Petrobras system denies any practice of corruption and utilizes rigorous management instruments to guarantee the protection of its shareholders' interests."

165.    This statement was materially false and misleading due to its omission of any mention of the bribery scheme and its effect of inflating Petrobras's costs.

166.    In a January 7, 2013 post to the Facts and Data website in response to questions from *Journal Nacional* about potential cost overruns at Comperj, Petrobras "reiterate[d] that there are no irregularities in the construction of the Abreu e Lima Refinery . . . [and] also reaffirms that there are no irregularities in the [Comperj] works."

167.     This statement was materially false and misleading due to its omission of any mention of the bribery scheme and its effect of inflating Petrobras's costs, including in connection with the Abreu and Lima Refinery and the Comperj project.

168.     On February 4, 2013, Petrobras issued a press release announcing its results of operations for the fourth quarter and full year of 2012, and on February 6, 2013, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for 2012.  The Company reported that as of December 31, 2012, it had net property, plant, and equipment of $205 billion, total assets of $332 billion, total costs and expenses of $19.6 billion including depreciation, depletion, and amortization of $11.1 billion, and net income of $10.9 billion.

169.     These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset value overstatements; and (3) Petrobras's stated net income failed to account for the bribery-related asset value overstatements.

170.     On April 26, 2013, Petrobras issued a press release announcing its results of operations for the first quarter of 2013.  The Company reported that as of March 31, 2013, it had net property, plant, and equipment of $214 billion, total assets of $345 billion, total costs and expenses of $9 billion including depreciation, depletion, and amortization of $3.2 billion, and net income of $3.9 billion.

171.     On April 30, 2013, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the first quarter of 2013, which set forth substantially similar figures as in the April 26, 2013 press release.

56

172.     These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset value overstatements; and (3) Petrobras's stated net income failed to account for the bribery-related asset value overstatements.

173.     On April 29, 2013, Petrobras filed the 2012 Form 20-F, which set forth substantially similar figures as in the February 4, 2013 press release.  The 2012 Form 20-F also included certifications substantially similar to those described in paragraph 113, signed by CEO Foster and CFO Barbassa, certifying that Petrobras's internal controls over financial reporting were effective.

174.     These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset value overstatements; (3) Petrobras's stated net income failed to account for the bribery-related asset value overstatements; and (4) Petrobras's internal controls over financial reporting were not effective.

175.     In or around May 2013, Petrobras published its 2012 Sustainability Report on its website.  This document included the following statements regarding the Company's anti-corruption policies:

> To ensure transparency in our relations with the Government, our Code of Ethics states that we **do not contribute to political parties or political campaigns of candidates to elective office.  We emphasize our refusal to countenance corrupt practices or**

*bribery*, and we maintain formal control procedures with consequences in the event of any transgressions in the company.

\*   \*   \*

No cases of corruption were detected in 2012.  ***We reject all corrupt practices and payment of bribes***, and we use the Competitive Conduct and Good Practice Codes, and follow the Federal Administration Code of Conduct which has its application overseen by the Public Ethics Commission of the Presidency.

\*   \*   \*

The company does not use child or slave labor, nor is it involved in prostitution or sexual exploitation of children or adolescents, ***or corruption***.

176.    These statements were false and misleading because Petrobras was contributing money to Workers' Party officials and other politicians and political parties, and was involved in an ongoing, multi-billion dollar bribery scheme.

177.    In an August 7, 2013 post to the Facts and Data website, Petrobras quoted statements Gabrielli had made at a hearing of the Environmental Commission, Consumer Protection and Inspection and Control, requested by Senator Ivo Cassol, during which Gabrielli denied any wrongdoing by Petrobras with respect to inflated contracts and insisted that "the acquisition [of the Pasadena Refinery] was a normal operation, based on market conditions."

178.    This statement was materially false and misleading due to its omission of any mention of the bribery scheme and its effect of inflating Petrobras's costs, including in connection with the Pasadena Refinery.

179.    On August 9, 2013; Petrobras issued a press release announcing its results of operations for the second quarter of 2013.  The Company reported that as of June 30, 2013, it had net property, plant and equipment of $204 billion, total assets of $338 billion, total costs and

expenses of $16.6 billion including depreciation, depletion and amortization of $3.4 billion, and net income of $2.7 billion.

180.    On August 13, 2013 Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the second quarter of 2013, which set forth substantially similar figures as in the August 9, 2013 press release.

181.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset value overstatements; and (3) Petrobras's stated net income failed to account for the bribery-related asset value overstatements.

182.    On October 25, 2013, Petrobras issued a press release announcing its results of operations for the third quarter of 2013.  The Company reported that as of September 30, 2013, it had net property, plant, and equipment of $208 billion, total assets of $340 billion, total costs and expenses of $27.6 billion including depreciation, depletion, and amortization of $3.3 billion, and net income of $1.5 billion.

183.    On October 28, 2013, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the third quarter of 2013, which set forth substantially similar figures as in the October 25, 2013 press release.

184.    These statements were materially false and misleading because: (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses were also overstated as a result of the

bribery-related asset value overstatements; and (3) Petrobras's stated net income failed to

account for the bribery-related asset value overstatements.

185.    In a November 13, 2013 post to the Facts and Data website in response to press

allegations regarding Petrobras's contracts with one of its contracts, the Company published a

"Clarification" of its bidding process and represented that "the process of biding, contracting and

executing Petrobras services are constantly being evaluated by its Internal Auditor and its

recommendations are diligently analyzed with a view to protecting the Company's interests."

186.    This statement was materially false and misleading due to its omission of any

mention of the bribery scheme and its effect of inflating Petrobras's costs and eliminating any

legitimate competitive bidding process.

187.    On February 25, 2014, Petrobras issued a press release announcing its results

of operations for the fourth quarter and full year of 2013.  The Company reported that as of

December 31, 2013, it had net property, plant, and equipment of $228 billion, total assets of

$321 billion, total costs and expenses of $16.9 billion including depreciation, depletion, and

amortization of $13.2 billion, and net income of $10.8 billion.

188.    The press release also quoted CEO Foster as stating:

> Additionally, I would like to notice that ***in the second half of 2013
> we implemented the Corruption Prevention Program***, reaffirming
> the commitment of the Petrobras Executive Board and of its
> employees with ethics and transparency at our organization.  The
> program complies with both national and international initiatives
> against fraud and corruption, as well as with the laws of the
> countries where Petrobras operates, with positive impacts in the
> relations with all its stakeholders.

189.    On February 26, 2014, Petrobras filed a Form 6-K with the SEC containing the

Company's financial statements for 2013, which set forth substantially similar figures as in the

February 25, 2014 press release.

190.    On March 7, 2014, Petrobras issued a press release regarding its internal controls over financial reporting, stating:

> Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013, based on the criteria established in Internal Control-Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). ***Based on such assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31, 2013.***

191.    On March 10, 2014, Petrobras filed a Form 6-K/A with the SEC setting forth substantially the same content as the March 7, 2014 press release.

192.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset value overstatements; (3) Petrobras's stated net income failed to account for the bribery-related asset value overstatements; and, (4) it was misleading for CEO Foster to tout the Company's Corruption Prevention Program while failing to disclose the Company's deep involvement in bribery and corruption; and (5) the Company's internal controls were not effective.

193.    On April 30, 2014, Petrobras filed the 2013 Form 20-F, which set forth substantially similar figures as in the February 25, 2014 press release. The 2013 Form 20-F also included certifications substantially similar to those described in paragraph 113, signed by CEO Foster and CFO Barbassa, certifying that Petrobras's internal controls over financial reporting were effective. The 2013 20-F represented that the Company had established ad hoc internal commissions "to evaluate our compliance with applicable regulations" and the "scope of each

internal commission is established by our management."  Significantly the 2013 20-F represented

that on "March 31, 2014, our internal commission established to evaluate bribery allegations

involving SBM Offshore confirmed that it found no internal evidence to support such allegations."

      194.    These statements were materially false and misleading because (1) Petrobras's

claimed asset valuations were materially overstated due to the improper inclusion of bribery-

related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's

stated depreciation, depletion and amortization expenses were also overstated as a result of the

bribery-related asset value overstatements; (3) Petrobras's stated net income failed to account for

the bribery-related asset value overstatements; (4) Petrobras's internal controls over financial

reporting were not effective; and (5) it was misleading to "confirm" that there was no internal

evidence to support allegations of bribery while failing to disclose the Company's deep

involvement in bribery and corruption.

      195.    In or around May 2014, Petrobras published its 2013 Sustainability Report on

its website.  This document included the following statements regarding the Company's anti-

corruption policies:

> In the second half of 2013, we introduced our Corruption
> Prevention Program,' which reaffirms Petrobras management and -
> workforce commitment to ethics and transparency in our
> organization.  The program meshes with local and international
> initiatives to combat fraud and corruption, and the legislation in
> countries in which we operate, thus favorably impacting relations
> with all stakeholders.
>
> In July, Petrobras introduced its Corruption Prevention Program in
> order to prevent; detect and correct fraud and corruption.  The
> program and its implementation are based on three aspects:
> prevention through education and clear policies on the importance
> of ethics in all our actions; mechanisms capable of detecting fraud
> or corruption; and a system of consequences to correct past
> problems.

The program's benefits include reduced exposure to legal, image and reputational risk, strengthened corporate governance, centralized efforts for the shared aim of combating fraud and corruption, and improved relationships with stakeholders, such as partners and sources of funding.

For our Internal Audit structure, the Executive Board approved a new General Controller Officer to strengthen implementation of control and compliance including mitigation of fraud and corruption risk, in order to meet legal and regulatory requirements. This decision was ratified by the Board of Directors in November. The responsibilities of this General Office include the Corruption Prevention Program.

All our suppliers and business partners are covered by our guidance on anti-corruption policies and procedures through our Code of Ethics stipulated in contractual instruments and posted on our website. ***The Code requires the process of selecting and signing suppliers to be based strictly on legal and technical criteria for quality, cost and punctuality.*** Suppliers must have ethical profiles in terms of their management practices and social and environmental responsibility. They must reject unfair competition practices or others contrary to the code's precepts, including our suppliers' supply chains.

Our standard contracts and services agreements now include an anti-corruption paragraph with procedures to be adopted in cases of illicit actions under Brazilian law, the 1977 Foreign Corrupt Practices Law (USA), or the Bribery Act 2010 (United Kingdom).

\*   \*   \*

***Our Code of Ethics includes a commitment to refuse to support or contribute to political parties or campaigns of candidates running for elected office.***

196.     These statements were false and misleading because (1) Petrobras was contributing money to Workers' Party officials and other politicians and political parties, and was involved in an ongoing, multi-billion dollar bribery scheme; (2) the Petrobras process for selecting and signing suppliers was not based strictly on criteria regarding quality, cost and punctuality; and (3) the Company failed to disclose the effect that the bribery scheme had upon its accounting.

197.    On May 9, 2014, Petrobras issued a press release announcing its results of operations for the first quarter of 2014.  The Company reported that as of March 31, 2014, it had net property, plant, and equipment of $241 billion, total assets of $354 billion, total expenses of $8.2 billion including depreciation, depletion, and amortization of $3.0 billion, and net income of $2.4 billion.

198.    The press release also quoted CEO Foster as stating:

> I would like to register, once again, the commitment of Petrobras Executive Board and of its employees with ethics and transparency at our organization, as expressed when we launched in the 2nd half of 2013, the Corruption Prevention Program.  All the allegations presented are and will continue to be investigated through the mechanisms created for this specific purpose.

199.    On May 12, 2014, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the first quarter of 2014, which set forth substantially similar figures as in May 9, 2014 press release.

200.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset value overstatements; (3) Petrobras's stated net income failed to account for the bribery-related asset value overstatements; and (4) it was misleading for Foster to tout the Company's Corruption Prevention Program while failing to disclose the multi-billion dollar bribery scheme that the Company had been operating.

201.    In a May 23, 2014 post to the Facts and Data website, Petrobras represented that "it has strict legal procedures for payments, including for the purchase of Pasadena. . . .  The payments made for any reason and in any country follow strict and clear procedures and relevant

legislation.   Additionally, the Company has a structured Internal Audit group, which has
unrestricted access to any unit of the Petrobras System to verify the compliance of procedures
and transactions made."

202.   This statement was materially false and misleading due to its omission of any
mention of the bribery scheme and its effect of inflating Petrobras's costs, including in
connection with the Pasadena Refinery.

203.   In a July 12, 2014 post to the Facts and Data website, Petrobras sought to
reassure investors that it "has not found any facts or documents evidencing the payment of bribes
to employees at Petrobras."

204.   This statement was materially false and misleading because Petrobras was
contributing money to Workers' Party officials and other politicians and political parties, and
was involved in an ongoing, multi-billion dollar bribery scheme.

205.   In a July 14, 2014 post to the Facts and Data website, Petrobras affirmed again
that there was no indication of irregularities and there was no overpricing or overbilling in
connection with the Abreu and Lima Refinery.

206.   This statement was materially false and misleading due to its omission of any
mention of the bribery scheme and its effect of inflating Petrobras's costs, including in
connection with the Abreu and Lima Refinery.

207.   On August 8, 2014, Petrobras issued a press release announcing its results of
operations for the second quarter of 2014.  The Company reported that as of June 30, 2014, it
had net property, plant, and equipment of $254 billion, total assets of $363 billion, total costs and
expenses of $22 billion including depreciation, depletion, and amortization of $3.5 billion, and
net income of $2.3 billion.

208.    On August 11, 2014, Petrobras filed a Form 6-K with the SEC containing the

Company's financial statements for the second quarter of 2014, which set forth substantially

similar figures as in the August 8, 2014 press release.

209.    These statements were materially false and misleading because (1) Petrobras's

claimed asset valuations were materially overstated due to the improper inclusion of bribery-

related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's

stated depreciation, depletion and amortization expenses were also overstated as a result of the

bribery-related asset value overstatements; and (3) Petrobras's stated net income failed to

account for the bribery-related asset value overstatements.

### C.    Petrobras's Corrective Disclosures and Their Impact on the Market

210.    After months of repeatedly and vehemently denying the existence of the

bribery and corruption scheme, on October 27, 2014, Petrobras issued a formal statement filed in

a Form 6-K with the SEC regarding Operation Car Wash.  In this statement, Petrobras

acknowledged for the first time that the facts revealed by the police investigation could have a

significant negative impact on its business.  The Company also outlined the steps it was taking in

response.  Petrobras announced that it had hired two "independent specialized investigation

companies," later identified as two law firms, to "examin[e] the nature, exten[t] and impacts of

the actions that might have been performed" at the Company and to "analyze correlated facts and

circumstances that might have [a] material impact over the Company's business."

211.    Also on October 27, 2014, Petrobras issued a press release entitled "Internal

steps taken by Petrobras in response to 'Lava Jato Operation.'"  The Company noted that it was

taking certain steps in response to the developing investigation, including:

> sign[ing] contracts with two independent investigation companies,
> a Brazilian and an American, with the aim of examining the nature,
> extension and impacts of the actions that might have been

> performed against the Company in the context of what have been
> said by former Director Paulo Roberto Costa.  These companies
> will also analyze correlated facts and circumstances that might
> have material impact over the Company's business.

212.    On this news, Petrobras's common ADSs declined $1.77 per ADS or nearly

14%, to close at $11.16 per ADS on October 27, 2014, and Petrobras's preferred ADSs declined

($1.97) or 14.64% to close at $11.49 on October 27, 2014.

213.    On November 1, 2014, the Brazilian newspaper *O Estado de Sao Paulo*

reported that Petrobras's auditor, PricewaterhouseCoopers ("PwC") had declined to sign off on

the Company's third quarter financial results in light of the money-laundering and bribery

investigations.  Specifically, PwC refused to sign off on the financial results for one of

Petrobras's subsidiaries, Transpetro, as they were signed by Sergio Machado ("Machado"), the

Petrobras executive implicated by Costa.  PwC urged the Company to take action to dismiss

Machado.  On November 3, 2014, Machado agreed to take a 31-day unpaid leave of absence.

Also on November 3, 2014, Petrobras issued a press release announcing that Machado had

"presented a letter to the Board of Directors of this subsidiary requesting a non-paid leave for the

next 31 days."  On this news, Petrobras's common ADSs declined ($0.44) or 3.76% to close at

$11.26 on November 3, 2014, and Petrobras's preferred ADSs declined ($0.56) or 4.58% to

close at $11.67 on November 3, 2014.

214.    On November 9, 2014, The Financial Times reported that the U.S. Department

of Justice ("DOJ") had opened a criminal investigation on whether Petrobras or its employees

were paid bribes and that the SEC had opened a civil investigation into the matter.  Specifically,

*The Financial Times* reported that the DOJ and the SEC were investigating whether Petrobras or

its employees, middlemen or contractors had violated the Foreign Corrupt Practices Act.

215.     On this news, Petrobras's common ADSs declined $0.28 per ADS or 2.5%, to close at $10.62 on November 10, 2014, and Petrobras's preferred shares declined ($0.23) or 2.04% to close at $11.04 on November 10, 2014.

216.     On November 13, 2014, after the market closed, the Company issued a press release acknowledging that if the allegations in Costa's testimony were true, they "could potentially impact the Company s financial statements."  As a result, the Company delayed releasing the financial statements for the third quarter 2014, stating that since it would need additional time to:

> (i) deeply analyze the investigation in course; (ii) adjust the Company based on the allegations of "Operacao Lava Jato;" and (iii) evaluate the need of improving governance control, the Company isn't ready to publish its balance sheet regarding the third quarter of 2014 on this date.

217.     Then, on November 14, 2014, prior to the trading session, Petrobras revealed that it would "release its third quarter 2014 financial statements, ***without a review by its Independent Auditors.***"  Petrobras further noted that:

> In light of the ongoing investigations, ***it is currently not possible for the Company to determine an estimated date*** for the disclosure of its Quarterly Financial Statements (ITR) for the period ended 09.30.2014, together with the review report issued by the Independent Auditors.

218.     That same day, Petrobras was rocked by more bad news when the Brazilian federal police arrested Renato Duque (Petrobras's former director of engineering and services from 2003-2012).  Duque's arrest revealed to the market that Costa's bribery and graft admissions were not the actions of a rogue employee, but instead spread throughout the Company.  That same day, the Brazilian federal police arrested 26 other likely Cartel members in connection with the investigation of Petrobras, including senior executives and contractors who had contracts with Petrobras worth approximately $59 billion.  The federal police also served

dozens of search warrants and raided the offices of 11 companies that they suspected of

participation in the scam.  The *Financial Times* and other publications reported that the offices of

Petrobras were among the offices that were raided.  Also on that same day, the Comptroller

General of Brazil announced that it was investigating allegations that Petrobras officials had

accepted bribes to award contracts to SBM, another large contractor.  Petrobras executives

admitted that SBM was not formally barred from future bid rounds.

219.    Also on November 14, 2014, Bank of America/Merrill Lynch downgraded

Petrobras's stock following revelations of lack of management integrity on the market: "We are

downgrading Petrobras's stock from Buy to Neutral, following postponement of its third quarter

earnings release until December 12 due to uncertainty as to financial effects of results of an

investigation by the Brazilian Federal Police into charges of money laundering and organized

crimes allegedly committed by a former director of the company and other individuals."

220.    On this news, Petrobras's common ADSs declined $0.25 per ADS or nearly

2.5%, to close at $9.95 on November 14, 2014, and Petrobras's preferred ADSs declined ($0.29)

or 2.76% to close at $10.23 on November 14, 2014.

221.    On November 17, 2014, before the market opened, Petrobras hosted a

conference call for analysts and investors to discuss certain aspects of the Company's operations

for the third quarter of 2014, provide additional detail regarding the Company's delayed financial

statements, and offer commentary on the effects on Petrobras of the unfolding bribery

accusations.

222.    In connection with these results, CEO Foster stated in part:

> In light of the accusations and investigations of [O]peration Car
> Wash . . .  Petrobras is unable to publish its third-quarter 2014
> financial statements because these accusations, if found to be true,
> could potentially affect the Company's financial statements.

69

A determining fact took place on October 8, 2014, when the depositions of former Downstream Executive Director, Mr. Paulo Roberto Costa, and Mr. Alberto Youssef, in a hearing at the 13th Federal Court of Parana, revealed information that may lead to possible adjustments in the financial statements of our Company.

Because of these depositions, therefore, ***we need more time to make any possible adjustments to the financial statements.*** More time is needed as well to gain greater understanding from the ongoing investigations by the independent law firms; and ***we need more time, as it is fundamentally important to improve our internal controls.***

Later, during the question-and-answer portion of the call, CFO Barbassa and CEO Foster engaged in the following exchanges in part:

[Analyst]: [I]f we suppose . . . BRL5 billion of overprice in the construction of [an asset], how would this be recognized in the balance sheet of the Company? What are the main line items that would be impacted?

**CFO Barbassa:** The adjustment that perhaps could be impacted if the accusations are proven to be true would refer to adjustments at fair price of the PP&E that was acquired. . . . In this case, ***this value should be removed from PP&E line item [adjusted] value*** and should be taken to the result.

**CEO Foster:** As for the amounts that we would be writing down in terms of our results, our official reference are the depositions made in court. This was what the judges are calling evidence, temporary evidence. So in this case, we have a schedule of activities and we have deadlines to each one of these activities.

For example, there is definition of criteria to measure the effects of losses caused by fraud. In here, ***in an objective and material fashion, our reference will be the depositions made so far,*** the evidence provided that will be submitted to Petrobras by the Federal Police. ***We will then use this evidence to have our writedowns, and do the write-downs year after year*** regarding companies A, B, C or D that we might have contracted.

Later in the day, in an article published by *Agencia Brasil,* Foster confirmed that SBM bribed Petrobras employees to win contracts. Foster stated that due to the "overwhelming

70

evidence of noncompliance," SBM "will no longer be eligible to bid for further contracts with Petrobras."[5]  Moreover, Foster admitted the following: "We [were] informed in the past that we had identified no irregularities at this matter.  After a few weeks or months, I was informed that there were indeed bribes to employees or former employees of Petrobras."  Jose Formigli, Petrobras's Head of Exploration and Production, also revealed the following:

> The CEO received a call and a letter where SBM said it had been told of credits to accounts in Switzerland by Public Prosecution in the Netherlands.  This overwhelming evidence outright – it's the company's own admission that I was aware of [the bribery].

223.    As the *Washington Post* noted in a November 17, 2014 article titled "'Operation Carwash' in Brazil causes normally staid business meeting to go off script," the conference call contained "[w]ords that nobody wants to hear at a quarterly results event for a world-renowned oil company with a $220.6 billion business plan to complete: 'corruption,' 'bribe,' 'federal police,' 'internal investigation,' 'over-invoicing,' 'governance,' 'difficult moment,' and 'painful.'"  As the *Washington Post* also noted, Foster's representations that no one within the Company "ha[d] any idea of the scale of the corruption problem" in March raised more questions than it answered: "So nobody knew anything.  If not, why not?  There are billions of dollars involved in Operation Carwash.  Two top executives were jailed."

224.    As a result of the Company's conference call and revelation of SBM bribing Petrobras's employees, Petrobras's common ADSs declined $0.62 per ADS or 6%, to close at $9.33 per ADS on November 17, 2014, and Petrobras's preferred ADSs declined ($0.59) or 5.77% to close at $9.64 on November 17, 2014.

---

[5]  Agencia Brasil, *Petrobras CEO Admits SBM Offshore Bribed Officials*, November 18, 2014.

225.    On November 20, 2014, it was reported in various media outlets in Brazil that a request was made to the Brazilian Prosecutor's Office in the Federal District and the Public Prosecutor at the Federal Audit Court for the immediate dismissal of Foster as the CEO of Petrobras and to establish a criminal inquiry into the matter.  According to a news article published by *Folhade S.Paulo*, the request argued that Foster did not testify truthfully herself when she testified at a hearing on June 11, 2014 before a congressional investigation committee looking into the scandal, the Comissao Parlamentar de Inquerito.[6]  Specifically, Foster testified falsely that Petrobras didn't receive any warning from Netherland's authorities concerning bribery payments by SBM to Petrobras's employees.

226.    On November 24, 2014, a similar article in Brazilian newspaper *Globo* reported that at the June 11, 2014 hearing Foster was asked if Petrobras had identified any evidence of payments amounting to $139 million to Petrobras employees or executives by SBM. Foster answered that the Company's internal committee "did not identify, within its activities and scope, payments of any benefits to any of our employees."  Next, Foster was asked whether Petrobras already knew about the suspicion of bribery to Petrobras employees since 2012.  Foster answered, "I do not confirm this information."

227.    Also on November 24, 2014, prior to the trading session, Petrobras issued a press release announcing that the Company had received a subpoena from the SEC on November 21, 2014.  The press release revealed that Petrobras was under investigation by the SEC and that the Company would be required to produce certain documents to the agency.

---

[6]    Folha De S.Paulo, *Opposition Party Demands Graca Foster's Immediate Withdraw From Petrobras' Presidency*, November 20, 2014.

228.    On this news Petrobras's common ADSs declined $0.34 per ADS or 3%, to close at $10.50 per ADS on November 24, 2014, and Petrobras's preferred ADSs declined ($0.38) or 3.32% to close at $11.06 on November 24, 2014.

229.    Investors looked forward to the Company's December 12, 2014 earnings release for clarity as to the impact of the corruption on the Company.  On December 11, 2014, *Forbes* noted that:

> Petrobras is expected to announce its unaudited financial results for the third quarter on December 12, after a delay of more than a month, primarily because of ongoing investigations into the alleged bribery and corruption scandal that has hit the company. We expect a focus on the potential impact of the ongoing probe to overshadow improvements in the company's key business drivers such as net upstream production and downstream margins.

230.    However, on December 12, 2014, the Company announced that it would delay **for the second time** the release of its third quarter 2014 financial statements as a result of new developments in the widening corruption probe, including the December 11, 2014 indictments of executives at Brazil's largest engineering firms for their participation in the kickback scheme. Although Petrobras had announced December 12, 2014 as its deadline for the release of these financial statements, it said in a statement that it actually had until January 15, 2015 to present the unaudited results without breaching any debt covenants.  *Bloomberg* reported that the real reason for the delay was due to "disagreement" among Petrobras's Board members, who "differ[ed] on the size of writedowns stemming from graft-related costs."

231.    On the same day, former Petrobras executive and whistleblower Fonseca appeared on a popular televised weekly news show in Brazil called *Fantástico* where she explained in great detail the significant efforts she made to alert Foster, Costa, and others to the corruption as far back as 2009.  Fonseca also detailed how, in 2008, while working under Costa, she discovered numerous irregularities and misappropriation of resources in connection with the

construction of the Abreu Refinery while working on an analysis of the costs associated with the refinery's construction.

232.    On December 15, 2014, Brazilian criminal authorities announced a formal indictment for Nestor Cerveró (the former head of Petrobras's distribution subsidiary) for acts of corruption and money laundering.  Cerveró was implicated in, among other things, receiving tens of millions of dollars of bribes in connection with the purchase of the Pasadena Refinery, as well as an additional $53 million in bribes in connection with a deal to supply offshore drilling vessels by Samsung Heavy Industries.  With Cerveró's arrest, investors learned that the corruption at Petrobras was more rampant and broader in scope than had previously been disclosed.  Due to his former position as International Director, Cerveró's arrest indicated that the criminal scheme was not confined to bribery and money laundering in Brazil, but was in fact international in scope.

233.    As the market absorbed Petrobras's failure to publish its third quarter results, Fonseca's allegations, and the news of Cerveró's indictment, Petrobras's common ADSs declined $0.72 per ADS or 10.3%, to close at $6.26 per ADS on December 15, 2014, and Petrobras's preferred ADSs declined $0.78 or 10.5% to close at $6.66 on December 15, 2014.

234.    Petrobras did not release its unaudited third-quarter financial statements until after the markets closed on January 27, 2015.  The Company's external auditor, PwC, did not sign off on Petrobras's third-quarter financial statements and its reported results did not contain any writedowns of Petrobras's PP&E.

235.    Nevertheless, in its January 27, 2015 earnings release, which it filed with the SEC on Form 6-K on January 28, 2015, Petrobras revealed the staggering scope of the corruption scheme.  In Note 3 to the release, in a heading titled "Reasons to correct the carrying amount of

74

specified property, plant and equipment," the Company acknowledged that "[t]he information currently available to the Company indicates that contracts entered into between January 1, 2004 and April 30, 2012 . . . with suppliers and contractors named in the depositions may have included amounts related to the misconduct by suppliers and contractors, political agents, Petrobras personnel and other people."

236.    The Company also admitted that it improperly capitalized as assets the inflated contract amounts confessed to by Costa, resulting in the material overstatement of its PP&E:

> The payments related to the misconduct previously mentioned were recognized as part of the cost of certain property, plant and equipment and, as of September 30, 2014, most of those assets were under construction or were recently completed, and therefore, had little accumulated depreciation.
>
> No impairment losses have been recognized in the past for the property, plant and equipment affected by the payments related to misconduct because their recoverability is tested for impairment in cash-generating units (CGU), whose value-in-use has been historically higher than their carrying amounts.  The recoverable amount calculated under the value-in-use approach includes the benefits of existing synergies between the assets that comprise the CGU.
>
> ***Therefore, under the circumstances described above, the Company believes that amounts related to the misconduct by third parties were capitalized as part of the historical cost of its property, plant and equipment and are still part of their carrying amount.  However, those costs should not have been capitalized.***

237.    Although Petrobras acknowledged that the corruption scandal would result in significant financial adjustments to the Company's balance sheet and income statement, it did not record an asset writedown.  However, as the Company disclosed, its internal review of certain assets impacted by the fraud indicated a range of potential writedowns anywhere between $1.5 billion and $34 billion.

238.    In a January 27, 2015 letter to shareholders that accompanied Petrobras's third-quarter results, Foster admitted that the "facts and proofs obtained in the 'Operation [Car Wash]' . . . have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets."  Foster also admitted that an internal review of assets impacted by the fraud uncovered R$88.6 billion (approximately $34 billion) of overvalued assets and R$27.2 billion (approximately $10 billion) of undervalued assets.  As Reuters reported: "If confirmed by auditors, that would lead to a [R$]61.4 billion [(approximately $22 billion)] writedown, amount equal to more than have the company's current [R$]120 billion [(approximately $43.3 billion) real market value."  In that same letter, Foster stated that the company was working with PwC to adjust its financial statements **and** to "enhance [its] internal controls"; the Company's earnings release identified several measures it was implementing to strengthen its internal controls.

239.    Also on January 27, 2015, the New York Times reported the background of Petrobras's decision not to take the corruption-related charge against earnings on its delayed third-quarter results.  It reported that the Company's Board failed to agree on the extent the graft had inflated the value of its assets and therefore decided to publish quarterly results without the write-off.  Other news sources have since reported that Petrobras's Board held a "marathon meeting" on January 27, 2015 that lasted about 10 hours, where two of President Rousseff's top appointees, Defendant Foster and Petrobras's current chairman and former finance minister heatedly disagreed about releasing a $30 billion write-down partially tied to the scandal-related losses.  Reportedly, the chairman left in the middle of the meeting to call Rousseff, telling his political benefactor that the $30 billion was a bad number conjured up by faulty methodology.

Rousseff agreed.  Later that evening, Defendant Foster had a different message for Rousseff.  In a phone call, Foster expressed the opinion that under Brazilian law the $30 billion figure, whether faulty or not, had to be released because if the board now knew the number, the market had a right to know it as well.  After the dramatic showdown, it was initially concluded that the number would in fact be included in a note to Petrobras's overdue third-quarter earnings.

240.     The next day, on January 28, 2015, Foster acknowledged that "the testimonies examined by Petrobras have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments."  Nevertheless, Petrobras released its delayed unaudited third-quarter results without the graft write-down, leaving investors in the dark over the financial impact of the multi-billion dollar corruption scandal.  It was reported that after initially concluding to take the writedown, the Board reversed itself under pressure from Chairman and former Finance Minister Guido Mantega, who is close to Brazil's ruling Workers' Party.

241.     After the meeting, Petrobras said in a statement that it "understands that it will be necessary to make adjustments at the financial statements to correct the [carrying] values of fixed assets that may have been impacted by amounts related to misconducts made by suppliers, politicians, Petrobras employees and other groups in the context of the Lava Jato operation." (emphasis added).  The revisions were necessary because court documents show "illicit acts, such as suppliers' cartelization and bribes received by former employees," Petrobras said.

242.     Caving to Rousseff, Defendant Foster changed her tune.  Foster said it was "impractical" to quantify the write-down because it was not easy to separate corruption-related charges from those caused by other factors.  Brazilian accounting experts questioned that

explanation.  "There is no reason for the company not to have estimated, even in a provisional way, the writedowns related to corruption," said Reginaldo Goncalves, an accounting professor at Faculdade Santa Marcelina, a Sao Paulo university.  "I have the strong impression that this is the government trying to avoid the inevitable."

243.    On this news, Petrobras's common ADSs declined ($0.89) or 11.95% to close at $6.56 on January 28, 2015, and Petrobras's preferred shares declined ($0.92) or 11.70% to close at $6.94 on January 28, 2015.

244.    On February 25, 2015, Moody's Investors Service cut Petrobras's bonds to junk, stripping them of their investment grade rating, as the Company faced a widening corruption probe.  The downgrade "reflects increasing concern about corruption investigations and liquidity pressures," Nymia de Almeida, an analyst at the rating company, said in a statement.  "Petrobras was already living the perfect storm," Adriano Pires, the head of Rio de Janeiro-based energy and infrastructure consulting firm CBIE, said.  "Now it is even worse."  On this news, Petrobras's common ADSs declined ($0.37) or 5.39% to close at $6.49 on February 25, 2015, and Petrobras's preferred ADSs declined ($0.47) or 6.72% to close at $6.52.

245.    On March 19, 2015, it was reported by a number of news sources that Swiss regulators seized $400 million of bank assets as part of the probe into Petrobras.  In addition *Thestreet.com* reported a number of problems tied to the Brazilian state-owned energy company's ongoing corruption scandal.  First, the TCU announced that it had chosen to investigate whether Petrobras board members mismanaged the company.  Also Brazil's Comptroller-General Office added six more construction and engineering firms to its investigation into contractors that allegedly participated in corrupt dealings at the energy company.  According to the article, this brings the total number of firms under investigation to

twenty four.  The claims allege that the firms overpriced their contracts in a multibillion-dollar scheme that pushed bribes to Petrobras executives and Brazilian politicians.

246.    On this news, Petrobras's common ADSs declined $0.40 or 7.07%, to close at $5.26 and Petrobras's preferred ADSs declined $0.36 or 6.26%, to close at $5.39 March 19, 2015.

247.    Petrobras's wrongful conduct, false statements, and omissions before and during the Relevant Period, as alleged herein, caused the Petrobras ADSs to trade at artificially inflated prices during the Relevant Period.  The revelation of previously misrepresented and concealed facts about Petrorbas's involvement in a decade-long bribery scheme and its impact on the Company's misrepresented financial statements, directly and proximately caused the damages suffered by Plaintiffs.  As the conditions described above were revealed to the market, the market prices for the Petrobras ADSs fell precipitously, and the ADSs lost the vast majority of their value.

### D.    Defendants' Knowledge of the Fraudulent Scheme

248.    During the Relevant Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted with reckless disregard for the true information known to them at the time for the reasons discussed above.  In doing so, Defendants committed acts, and practiced and participated in a course of business that operated as a fraud or deceit on purchasers of the securities, such as Plaintiffs.

### 1.    Petrobras

249.    The evidence that Petrobras knew of the bribery scheme, the inflation of Petrobras asset valuations, and the falsity of the statements discussed in Section V.B. above, or at a minimum was reckless for not knowing these matters, includes the following:

- Persons involved in implementing the bribery scheme and inflating Petrobras's asset values were high-ranking Petrobras executives, including the former head of Petrobras's refining division and former director of engineering and services, whose knowledge may be imputed to Petrobras.

- From 2009 to 2013, the TCU reported directly to Petrobras's Board regarding widespread overcharging on contracts and irregular tendering practices at the Abreu Refinery and recommended that the project be suspended until the irregularities were resolved.  The Board overruled this recommendation.

- Prosecutors have frozen the assets of former CEO Gabrielli and are preparing an indictment against him in connection with his involvement in the bribery scheme.  One of the persons involved in the scheme has said that Petrobras's CEO and President Rousseff (who was the Chairwoman of the Petrobras Board from 2003 to 2010) both knew of and understood the scheme.

- In 2009, a Petrobras executive warned then-CEO Foster about inflated contracts on refinery projects and was fired soon thereafter.

- The fact that the scheme involved many outside parties of major importance to Petrobras, including 23 contractors, dozens of politicians from six political parties, and a former energy minister, supports an inference that the Company knew of the scheme or was reckless for not knowing of it.

- The fact that the scheme caused Petrobras's asset values to be overstated by over $2.5 billion supports an inference that the Company knew of the scheme or was reckless for not knowing of it.

- The fact that the scheme related to major assets and critical infrastructure of the Company, such as key refineries, which are typically the subject of close, ongoing scrutiny by a company's senior management, supports an inference that the Company knew of the scheme or was reckless for not knowing of it.

### 2.    Foster

250.    The evidence that Foster knew of the bribery scheme, the inflation of Petrobras asset valuations, and the falsity of the statements discussed in Section V.B. above, or at a minimum was reckless for not knowing these matters, includes the following:

- One of the persons involved in the scheme has said that Petrobras's CEO and President Rousseff (who was the Chairwoman of the Petrobras Board from 2003 to 2010) both knew of and understood the scheme.

- In 2009, a Petrobras executive warned Foster about inflated contracts on refinery projects and was fired soon thereafter.

- The fact that the scheme involved many outside parties of major importance to Petrobras, including 23 contractors, dozens of politicians from six political parties, and a former energy minister, supports an inference that as CEO, Foster knew of the scheme or was reckless for not knowing of it.

- The fact that the scheme caused Petrobras's asset values to be overstated by over $2.5 billion supports an inference that Foster, as CEO, knew of the scheme or was reckless for not knowing of it.

- The fact that the scheme related to major assets and critical infrastructure of the Company, such as key refineries, which are typically the subject of close, ongoing scrutiny by a company's senior management, supports an inference that Foster, as CEO of the Company, knew of the scheme or was reckless for not knowing of it.

### 3.    Gabrielli

251.    The evidence that Gabrielli knew of the bribery scheme, the inflation of

Petrobras asset valuations, and the falsity of the statements discussed in Section V.B. above, or at

a minimum was reckless for not knowing these matters, includes the following:

- Prosecutors have frozen Gabrielli's assets and are preparing an indictment against him.  One of the persons involved in the scheme has said that Petrobras's CEO and President Rousseff (who was the Chairwoman of the Petrobras Board from 2003 to 2010) both knew of and understood the scheme.

- The fact that the scheme involved many outside parties of major importance to Petrobras, including 23 contractors, dozens of politicians from six political parties, and a former energy minister, supports an inference that as CEO, Gabrielli knew of the scheme or was reckless for not knowing of it.

- The fact that the scheme caused Petrobras's asset values to be overstated by over $2.5 billion supports an inference that Gabrielli, as CEO, knew of the scheme or was reckless for not knowing of it.

- The fact that the scheme related to major assets and critical infrastructure of the Company, such as key refineries, which are typically the subject of close, ongoing scrutiny by a company's senior management, supports an inference that Gabrielli, the CEO of the Company, either knew of the scheme or was reckless for not knowing of it.

### 4. Barbassa

252. The evidence that Barbassa knew of the bribery scheme, the inflation of

Petrobras asset valuations, and the falsity of the statements discussed in Section V.B. above, or at

a minimum was reckless for not knowing these matters, includes the following:

- The fact that the scheme involved many outside parties of major importance to Petrobras, including 23 contractors, dozens of politicians from six political parties, and a former energy minister, supports an inference that as CFO, Barbassa knew of the scheme or was reckless for not knowing of it.

- The fact that the scheme caused Petrobras's asset values to be overstated by over $2.5 billion supports an inference that Barbassa, as CFO, knew of the scheme or was reckless for not knowing of it.

- The fact that the scheme related to major assets and critical infrastructure of the Company, such as key refineries, which are typically the subject of close, ongoing scrutiny by a company's senior management, supports an inference that as CFO of the Company, Barbassa knew of the scheme or was reckless for not knowing.

### 5. PricewaterhouseCoopers Auditores Independentes

253. As described more fully in Section IV.F. above, in connection with its audits of

Petrobras for the years ended December 31, 2013 and 2012, PwC turned a blind eye to

Petrobras's systemic and pervasive scheme of overstating the Company's PP&E. This evidence

demonstrates that PwC knew of the bribery scheme, the inflation of Petrobras asset valuations,

and the falsity of the statements discussed in Section V.B. above, or at a minimum was reckless

for not knowing these matters.

### E. Plaintiffs' Reliance upon Defendants' Misrepresentations to Their Detriment

### 1. Plaintiff's Actual Reliance on Defendants' Misrepresentations

254. Mr. Saïd regularly reviewed reports from the press and industry analysts

regarding Petrobras, which often repeated Petrobras's false and misleading statements outlined

above. Based largely on these reports, Mr. Saïd believed that Petrobras's earnings, its likelihood

of future profitability, and the adequacy of its auditing and internal controls made the purchase of

Petrobras ADSs a wise investment.  Accordingly, Mr. Saïd relied on the accuracy of Petrobras's

representations in his purchase of Petrobras ADSs and was damaged thereby.

## 2.      The Fraud on the Market Presumption of Reliance

255.     A presumption of reliance is also established by the fraud-on-the-market

doctrine in that, among other things:

- Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

- the omissions and misrepresentations were material;

- the Petrobras ADSs traded in an efficient market;

- the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Petrobras ADSs; and

- Plaintiffs purchased the Petrobras ADSs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

256.     At all relevant times, the markets for the Petrobras ADSs were efficient for the

following reasons, among others:

- as a regulated issuer, Petrobras filed periodic public reports with the SEC on a consolidated basis;

- Petrobras regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

- Petrobras was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force(s) and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

- the Petrobras ADSs were actively traded in efficient markets, including the NYSE, where the Company's common and preferred ADSs trade under the ticker symbols "PBR" and "PBR/A," respectively.

257.     As a result of the foregoing, the markets for the Petrobras ADSs promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the Petrobras ADSs.  Under these circumstances, Plaintiffs suffered similar injury through their purchase of the Petrobras ADSs at artificially inflated prices and the presumption of reliance applies.

258.     Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153 (1972).

### 3.     No Safe Harbor

259.     Defendants' verbal "Safe Harbor" warnings accompanying their oral forward-looking statements issued during the Relevant Period were ineffective to shield those statements from liability.

260.     Defendants also are liable for any false or misleading forward-looking statements pleaded herein because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Petrobras who knew that the forward-looking statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

### F.      Plaintiffs' Losses as a Result of Their Purchases of Petrobras Securities

261.    During the Relevant Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Petrobras ADSs, and operated as a fraud or deceit on Plaintiffs by misrepresenting Petrobras's asset values, expenses, net income, and whether the Company suffered from material weaknesses in internal controls.

262.    Later, as the truth relating to Defendants' prior false statements, misrepresentations, and fraudulent conduct were disclosed to the market, the price of the Petrobras ADSs fell as the "value" of the prior artificial inflation was eliminated from the price of the ADSs.  As a result of their purchases of the Petrobras ADSs during the Relevant Period, Plaintiffs suffered damages, in the form of economic loss, under the federal securities laws.

## VI.     CAUSES OF ACTION

### <u>COUNT I</u>
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

263.    Plaintiffs repeat, incorporate, and reallege paragraphs 1 through 262  During the Relevant Period, Defendants disseminated or approved the false statements specified above, which they knew to be false and misleading, or were reckless in their disregard as to the truth of such statements, in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

264.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)      employed devices, schemes, and artifices to defraud;

(b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)      engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of the Petrobras ADSs during the Relevant Period.

265.    Plaintiffs have suffered damages in that, in reliance on Defendants' statements and the integrity of the market, they paid artificially inflated prices for the Petrobras ADSs. Plaintiffs would not have purchased such securities at the prices they paid, or at all, if they had been aware that the market prices of such securities had been artificially and falsely inflated by Defendants' misleading statements.

266.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the Petrobras ADSs during the Relevant Period.

<u>**COUNT II**</u>
**For Violations of Section 18 of the Exchange Act**
**Against All Defendants**

267.    Plaintiffs repeat, incorporate, and reallege paragraphs 1 through 262 by reference.

268.    Defendants made or caused to be made statements which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC by Petrobras, including filings made on Form 20-F.

269.     Specifically, in connection with the purchase of Petrobras ADSs since April 2, 2013, Plaintiffs and/or their respective agents actually read and relied upon analyst reports and press materials that included the false and misleading statements set forth above.  Plaintiffs and/or their respective agents relied on the statements in those materials as being materially complete, and as not omitting material information. The reliance by Plaintiffs and/or their respective agents was reasonable.

270.     When the truth began to emerge about the false and misleading statements and omissions in the documents and reports filed by Petrobras with the SEC, Plaintiffs were damaged by the resulting drop in the value of the Petrobras ADSs.

271.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with its purchases of the Petrobras ADSs since April 2, 2013.

272.     Plaintiffs are filing this action within one year following discovery of the facts constituting the violation, and within three years after the violations with respect to Plaintiffs' investments.

### COUNT III
**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

273.     Plaintiffs repeat, incorporate, and reallege paragraphs 1 through 262 by reference.

274.     The Individual Defendants acted as controlling persons of Petrobras within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about the Company, the Individual Defendants had the power and ability to control the actions of Petrobras and the employees thereof.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## VII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.     Requiring Defendants to pay damages sustained by Plaintiffs by reason of the acts and transactions alleged herein;

B.     Awarding Plaintiffs pre- and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

C.     Awarding such other and further relief as this Court may deem just and proper.

## VIII.   JURY DEMAND

275.   Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated: August 7, 2015

QUINN EMANUEL URQUHART & SULLIVAN, LLP

_____

Harry A. Olivar, Jr. (HO-5621)
Kristen Bird (*pro hac vice admission pending*)
Joseph C. Sarles (*pro hac vice admission pending*)
Ryan S. Landes (*pro hac vice admission pending*)
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Peter E. Calamari (PEC-3964)
Todd D. Batson (TB-0629)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100